**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

MICHAEL WALKER, individually,

      Plaintiff,

vs.                              Civil Action No. : 3:18-cv-01523

M. H. LOVEJOY, in his individual capacity,
B.E. DONAHOE, in his individual capacity,
B.W. PAULEY, in his individual capacity,
PUTNAM COUNTY COMMISSION, a
political subdivision of the State of West
Virginia,

      Defendants.

**<u>RESPONSE TO PARTIAL MOTION TO DISMISS</u>**

      Comes now the plaintiff, Michael Walker, by and through counsel, and for his response to the Defendants' Partial Motion to Dismiss requests that this Honorable Court deny the partial motion to dismiss, and furthermore states as follows:

      As plaintiff understands the defendants' motion, the defendants are only seeking partial dismissal as to Defendant Lovejoy, and for the Putnam County Commission on the Monnell / Municipal Liability Claim.  However, many of the issues involving Defendant Lovejoy area the same <u>Terry</u> issues which involving defendants Donahoe and Pauley. As such, some of the discussion must be intertwined.

<u>QUALIFIED IMMUNITY GENERALLY</u>

      Defendants assert qualified immunity in their motion to dismiss, arguing that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  However, assuming the plaintiff's allegations to

be true, which is the standard for a motion to dismiss, the defendants' conduct plainly and clearly violated the plaintiff's constitutional rights.  The defendants are asking the court to weigh the facts alleged by the plaintiff, and to make a finding regarding the parties' competing versions of facts, which would be improper for a Rule 12(b)(6) determination.

Count One of the complaint makes a claim under 42 USC 1983 for unreasonable search and seizure in violation of the Fourth Amendment occurring on December 18, 2016.  Plaintiff alleges in paragraphs 45 through 54, which also incorporate the factual allegations in the previous paragraphs, that plaintiff was exercising his rights to open carry a firearm, and that he was subjected to an unreasonable search as a result thereof.  It is alleged that a Fourth Amendment seizure of the plaintiff occurred by Defendant Lovejoy, under color of law.  It is alleged that there was no legal basis for such a seizure: that there was no warrant; no consent; nor other justification to engage in a seizure.  It was alleged that the plaintiff was found not guilty of the obstruction charge arising therefrom, and that he had committed no crime.  If true, Defendant Lovejoy would not be entitled to qualified immunity due to the fact that his actions clearly violated the plaintiff's constitutional rights under the Fourth Amendment. Defendant is seeking for a weighing of the facts, which is improper at the motion to dismiss stage.

Count Two makes a claim under 42 USC 1983 for unreasonable search and seizure in violation of the Fourth Amendment for false arrest occurring on December 18, 2016 by Defendant Lovejoy against the plaintiff.  Plaintiff alleges in paragraphs 55 through 62, which also incorporate the factual allegations in the previous paragraphs,

that plaintiff was arrested by the defendant for doing nothing more than open-carrying a firearm, as was his right to do under West Virginia law.  It was alleged that plaintiff had committed no crime, and that there was no probable cause to arrest him. Plaintiff was found not guilty of the charge.  For Lovejoy to arrest the plaintiff with no probable cause would clearly and plainly constitute a violation of the plaintiff's constitutional rights.

Count Three makes a claim under 42 USC 1983 for violation of the Fourth Amendment on February 21, 2017 when plaintiff was walking down the side of the roadway while legally open-carrying a firearm. As alleged in paragraphs 66 and 67 of the complaint, at the time a Fourth Amendment seizure of the plaintiff occurred, he was not suspected of having committed any crime.  Nor was any crime suspected to have been committed by any person in the vicinity.  Plaintiff suffers from seizures, and is required to walk.  He was on his way to go hunting/trapping lawfully carrying his rifle over his shoulder in a safe manner, as he has done for years.  The officers had no reason to believe that plaintiff was a person prohibited from possessing a firearm. Nevertheless, he was subject to a search and seizure while officers obtained his identification and ran a background check on him, refusing to allow him to go on his way, and in the course of doing so, calling the plaintiff a "cocksucker," among other things.

Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties. *See, e.g.*, Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." In re Allen, 106 F.3d 582,

594 (4th Cir. 1997) (internal quotation marks omitted.) The defense of qualified immunity

is available unless the official "knew or reasonably should have known that the action he

took within his sphere of official responsibility would violate the constitutional rights of

the plaintiff...." Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982) (internal emphases

omitted). Officials are protected even if they make reasonable mistakes of fact or law, so

long as they do not violate a clearly established statutory or constitutional right.

Pearson, 555 U.S. at 231–32. "A constitutional right is 'clearly established' when its

contours are sufficiently clear that a reasonable official would understand that what he is

doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (internal

quotation marks and citations omitted).

  Fourth Circuit case law has long been clear that the defendants cannot perform a

"Terry stop" of a person lawfully open-carrying a firearm for the purposes of checking his

ID and running a background check to determine whether the person is a prohibited

person, or to otherwise disarm him, without more.  Although brief encounters between

police and citizens require no objective justification, United States v. Weaver, 282 F.3d

302, 309 (4th Cir. 2002), it is clearly established that an investigatory detention of a

citizen by an officer must be supported by reasonable articulable suspicion that the

individual is engaged in criminal activity. Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. 1868

(1968).

  Terry came out in 1968. Weaver had been around for 15 years prior to the

seizure of the plaintiff. Reid v. Georgia since 1980, Griffen since 2009, and Black since

2013 (quoting a 1993 case).  There is no rational basis to claim that these defendants'

ignorance of long-established case law was anything but reckless, malicious, bad faith,

or plainly incompetent.  As such, there is no basis for the application of qualified immunity to the plaintiff's claims - especially at the Rule 12(b)(6) stage where there are factual disagreements.  To do specifically what the federal courts have repeatedly said is unconstitutional is not a reasonable mistake of fact or law entitling an officer to qualified immunity.  It is the very definition of taking an action which any reasonable police officer would know is unjustified and unconstitutional.  A police officer cannot perform a <u>Terry</u> seizure without some sort of traffic stop, or a reasonable articulable suspicion of criminal wrongdoing (in non-vehicle scenarios).

<u>DECEMBER 18, 2016 SEARCH AND SEIZURE</u>

Defendant Lovejoy argues that he was justified in performing a Fourth Amendment seizure against the plaintiff on December 18, 2016 under <u>Terry v. Ohio</u>. Under the facts alleged in this case, as illustrated in detail in the Complaint, a <u>Terry</u> frisk was not justified.  And even if it were, Lovejoy did not just engage in a <u>Terry</u> frisk, but went well beyond a "brief encounter."  The defendants argue Lovejoy's version of the facts, rather than assuming the plaintiff's facts to be true.  Defendants seek to compare the case *sub judice*, to cases where there are allegations or instances of criminal activity.  They ignore the entire basis of this lawsuit, which is the fact that there were no allegations or suspicions of illegal activity by the plaintiff.  The sole purpose of their actions was their presumption that the plaintiff may be a prohibited person to possess a firearm, or possibly their ignorant and reckless policy that persons open-carrying firearms are subject to investigatory detentions and background checks.  Lovejoy, and indeed all the defendants, engaged in seizures of the plaintiff in order to ascertain whether their suspicions that he was a prohibited person were true, or in carrying out an

5

anti-Second Amendment policy.  Established case law, from this circuit and elsewhere, expressly forbids that very conduct and policy.

There can be no question that there was a seizure of the plaintiff for Fourth Amendment purposes. A person is "seized" within the meaning of the Fourth Amendment if, " 'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Gray, 883 F.2d 320, 322 (4th Cir.1989) (*quoting* United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Specific factors to consider in determining whether a reasonable person would feel free to leave include: (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they "touched the defendant or made any attempt to physically block his departure or restrain his movement"; (v) "the use of language or tone of voice indicating that compliance with the officer's request might be compelled"; (vi) whether the officers informed the defendant that they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature"; and (vii) "whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it." Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870; Gray, 883 F.2d at 322–23.

The Fourth Circuit has noted that though not dispositive, "the retention of a citizen's identification or other personal property or effects is highly material under the totality of the circumstances analysis." United States v. Black, 707 F.3d 531, 538 (2013) (*citing* Weaver, 282 F.3d at 310 (emphasis added)). In Black, the Court found that, "[i]t is clear that when Officer Zastrow expressly told Black he could not leave, Black was

6

*already* seized for purposes of the Fourth Amendment." <u>Black</u> at 538 (emphasis original).  Here, the same fact is present.  Plaintiff was expressly told he could not leave. Lovejoy handcuffed the defendant and forcibly dragged him back towards the scene. Therefore, a seizure for Fourth Amendment purposes cannot be disputed.  Defendants claim the seizure was justified because they were engaging in a <u>Terry</u> stop. Such an argument is absurd, and ignores the actual allegations in the complaint.

To be lawful, a <u>Terry</u> stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." <u>Reid v. Georgia</u>, 448 U.S. 438, 440, 100 S. Ct. 2752 (1980).  The level of suspicion must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States v. Griffin</u>, 589 F.3d 148, 152 (4th Cir. 2009).  As such, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21, 88 S. Ct. 1868. Moreover, the Fourth Circuit has already made it very clear that in states where open carry is legal, such as West Virginia, if officers have no *individualized* information that a particular individual who is lawfully open-carrying is a prohibited person, the mere exercise of their rights by open-carrying "cannot justify an investigatory detention."  Indeed, the Court held that "Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." <u>United States v. Black</u>, 707 F.3d 531, 540 (2013) (*quoting* <u>United States v. King</u>, 990 F.2d 1552, 1559 (10th Cir. 1993)).

Defendants cite the recent decision of <u>United States v. Robinson</u>, 846 F.3d 694 (2017) to support their arguments that they were engaging in a justified <u>Terry</u> seizure.

7

However, the defendants again are ignoring a huge differences in facts.  In <u>Robinson</u>,

the Court merely reiterating a 1977 U.S. Supreme Court holding that an officer who

makes a lawful traffic stop and who has a reasonable suspicion that one of the

automobile's occupants is armed may frisk that individual for the officer's protection and

the safety of everyone on the scene. <u>Robinson</u> at 696 (*citing* <u>Pennsylvania v. Mimms</u>,

434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).  <u>Robinson</u> changes nothing.

The plaintiff was not the subject of "a lawful traffic stop," and nor was he a passenger

with a potential concealed handgun in the car which had been the subject of "a lawful

traffic stop."

On December 18, 2016, the plaintiff was seized by Lovejoy solely because he

was open-carrying a firearm.  Lovejoy was already at the scene of the domestic

disturbance, which did not involve plaintiff, for approximately 30 to 45 minutes before

noticing that the plaintiff was open-carrying a handgun. (Compl. at 11).  At the time, the

plaintiff was approximately 50 feet away from Lovejoy and was not causing any

problems or safety concerns.  Plaintiff was only standing nearby in order to assist as a

witness to the domestic incident which had occurred earlier, and which he had

witnessed.  He was a voluntary witness and should have been free to leave at any time.

(Compl. at 6, 12)  Upon noticing the pistol, Lovejoy walked over towards the plaintiff and

said, "Look at me you stupid son of a bitch, you're putting all of our damned lives at risk

because you're carrying a gun."  Lovejoy then said he was confiscating the pistol.

(Compl. at 13) The plaintiff responded that he didn't want to give him his pistol, and that

he would voluntarily leave the property.  Lovejoy then told the plaintiff that he was not

free to leave, because he might sneak around and start shooting law enforcement.  He

then handcuffed and arrested the plaintiff for the frivolous charge of "obstructing an officer." (Compl. at 14-16).  Plaintiff was found not guilty following a trial.  A little over a year later, the same sheriff's department seized the plaintiff once again for lawfully open-carrying a firearm, as he was entitled to do.

Plaintiff wasn't subject to a Terry frisk because he just happened to get pulled over and looked suspicious.  He wasn't involved in any forced encounter with law enforcement.  He wasn't pulled over, or otherwise confronted or questioned by law enforcement.  He was merely standing around 50 feet away offering to serve as a voluntary witness.  It wasn't until after Lovejoy noticed the gun that the encounter/stop was initiated and Lovejoy announced he was confiscating the gun and announced that he wasn't free to leave.  The plaintiff stated that he was leaving, but was at that point detained and stopped from leaving. Plaintiff was not suspected of having committed any crime, nor was he in a vehicle subject to a traffic stop.  Therefore, he could not legally be subject to a Terry stop.

Defendants rely entirely on case law stemming from a lawful traffic stop, which is irrelevant to the case at hand, since it was not a traffic stop. For an "on the street" stop, such as occurred in Terry itself, a Terry stop still "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440, 100 S. Ct. 2752 (1980).  Even assuming this was not a Rule 12(b)(6) discussion, defendants cannot point to any criminal activity which would justify the seizure which occurred.  The stop occurred because Lovejoy saw the handgun being legally carried by the plaintiff at approximately a 50 foot distance, and who was at all time free to leave at any time.  The stop occurred because

9

Lovejoy saw the gun, and automatically assumed that no citizen should be allowed to be anywhere near the presence of law enforcement while armed, because they could start murdering law enforcement at any time - despite the complete lack of any suspicion of criminal activity or prohibited person status.

The Fourth Circuit already decided the open-carry and <u>Terry</u> related issues, such as exist in this case (both in regards to the 2016 event, as well as the 2018 event), in <u>Black</u>, wherein the Court noted its frustration in law enforcement repeatedly engaging in illegal <u>Terry</u> stops, such as happened to the plaintiff:

> At least four times in 2011, we admonished against the Government's misuse of innocent facts as indicia of suspicious activity. *See* <u>United States v. Powell</u>, 666 F.3d 180 (4th Cir.2011); <u>Massenburg</u>, 654 F.3d 480;<u>United States v. Digiovanni</u>, 650 F.3d 498 (4th Cir.2011); and <u>United States v. Foster</u>, 634 F.3d 243 (4th Cir. 2011). Although factors "susceptible of innocent explanation," when taken together, may "form a particularized and objective basis" for reasonable suspicion for a <u>Terry</u> stop, <u>United States v. Arvizu</u>, 534 U.S. 266, 277–78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), this is not such a case. Instead, we encounter yet another situation where the Government attempts to meet its Terry burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion.
> …
>
> Second, Gates' prior arrest history cannot be a logical basis for a reasonable, particularized suspicion as to Black. Without more, Gates' prior arrest history in itself is insufficient to support reasonable suspicion as to Gates, much less Black. *See* <u>Powell</u>, 666 F.3d at 188 ("[A] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." (citation omitted)). Moreover, we "ha[ve] repeatedly emphasized that to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." <u>DesRoches v. Caprio</u>, 156 F.3d 571, 574 (4th Cir.1998) (quotation marks and alterations omitted) (emphasis added). In other words, the suspicious facts must be specific and particular to the individual seized. Exceptions to the individualized suspicion requirement "have been upheld only in 'certain limited circumstances,' where the search is justified by 'special needs' "—that is, concerns other than crime detection—and must be justified by balancing the individual's privacy expectations against the government interests. <u>Id</u>. (*quoting* <u>Chandler v. Miller</u>, 520 U.S. 305, 308, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)); *see* <u>Treasury Employees v. Von Raab</u>, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Here, the Government has not identified any

substantial interests that override Black's interest in privacy or that suppress the normal requirement of individualized suspicion.

Third, it is undisputed that under the laws of North Carolina, which permit its residents to openly carry firearms, see generally N.C. Gen.Stat. §§ 14–415.10 to 14– 415.23, Troupe's gun was legally possessed and displayed. The Government contends that because other laws prevent convicted felons from possessing guns, the officers could not know whether Troupe was lawfully in possession of the gun until they performed a records check. Additionally, the Government avers it would be "foolhardy" for the officers to "go about their business while allowing a stranger in their midst to possess a firearm." We are not persuaded.

Being a felon in possession of a firearm is not the default status. More importantly, ***where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states***. <u>United States v. King</u>, 990 F.2d 1552, 1559 (10th Cir.1993) (emphasis added). Here, Troupe's lawful display of his lawfully possessed firearm cannot be the justification for Troupe's detention. *See* <u>St. John v. McColley</u>, 653 F.Supp.2d 1155, 1161 (D.N.M.2009) (finding no reasonable suspicion where the plaintiff arrived at a movie theater openly carrying a holstered handgun, an act which is legal in the State of New Mexico.) That the officer had never seen anyone in this particular division openly carry a weapon also fails to justify reasonable suspicion. From our understanding of the laws of North Carolina, its laws apply uniformly and without exception in every single division, and every part of the state. Thus, the officer's observation is irrational and fails to give rise to reasonable suspicion. To hold otherwise would be to give the judicial imprimatur to the dichotomy in the intrusion of constitutional protections.

<u>Black</u> at 540.

Judge Gregory was speaking to exactly the circumstances which occurred to the

plaintiff.  Law enforcement officers who, for whatever reason, chose to target an

individual who, as far as they knew, had committed no crime.  They cannot abuse <u>Terry</u>

so as to give themselves free reign to search and seize law abiding citizens who choose

to open-carry firearms.  Plaintiff was arrested, sent to jail, interrogated, called a "son of

a bitch," and a "cocksucker" by the defendant police officers - all for choosing to

exercise his rights to open-carry a firearm.  They cannot violate a citizen's rights in such

a way and expect to receive qualified immunity.  Furthermore, the political subdivision employer must be held accountable under Monnell for a pattern, practice and policy of such behavior, all of which was supported through a failed prosecution of the plaintiff, and their responses to the instant lawsuit.

<u>DECEMBER 18, 2016 FALSE ARREST</u>

Defendants are seeking dismissal of the count for false arrest "because he was arrested with probable cause."  Yet again, the defendants ignore the Rule 12(b)(6) standard.  Paragraph 57 of the complaint alleged that, "Defendant Lovejoy seized the plaintiff without a warrant, and without probable cause."  Paragraph 58 alleged, "The plaintiff had committed no crime, and was lawfully open-carrying a pistol as was his right to do under West Virginia law.

At the time of the arrest, the facts and circumstances within Defendant Lovejoy's knowledge were not sufficient to warrant a reasonably prudent person to believe in the circumstances shown that the plaintiff had committed a crime. *See* Caldarola v. Calabrese, 298 F.3d 156 (2d Cir. 2002).  Therefore, there was no probable cause present at the time of the arrest. Although in criminal cases the question of whether a police officer had probable cause to make an arrest is a question for the court to decide, there is substantial authority that in § 1983 cases this issue should be submitted to the jury upon proper instructions defining probable cause.  Thacker v. City of Columbus, 328 F.3d 244 (6th Cir. 2003); Montgomery v. De Simone, 159 F.3d 120 (3dCir. 1998); McKenzie v. Lamb, 738 F.2d 1005 (9th Cir. 1984); Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996).

Defendants blatantly disregard the allegations in the complaint and insert their

own version of the facts, as illustrated by the following argument in their memorandum:

> As stated above, Deputy Lovejoy was at the time of the incident attempting to
> conduct a lawful *Terry* protective frisk to remove a weapon from a dangerous law
> enforcement confrontation . . . .

(Def.'s Mem. at 9).  The entire point of the plaintiff's lawsuit are the allegations that there

was no justification for a <u>Terry</u> stop or seizure in the first place.  Defendant's premise in

their motion to dismiss is that there was a "dangerous law enforcement confrontation,"

which is unsupported by the allegations in the complaint, or otherwise.

There was no confrontation between the plaintiff and Lovejoy.  Plaintiff was not

involved in the domestic disturbance to which Lovejoy responded.  Lovejoy had already

been at the location for 30 to 45 minutes dealing with the individuals who were involved

with the domestic situation.  Plaintiff was around 50 feet away as a bystander and

potential witness, should he be needed.  He was only approached by Lovejoy when

Lovejoy noticed the handgun being carried.  Lovejoy only then "confronted" the plaintiff

for open carrying a handgun.  There was no traffic stop.  There was no suspicion of

criminal activity by the plaintiff.  There is no legal means through which Lovejoy can

justify a <u>Terry</u> stop/seizure.

A <u>Terry</u> stop still "must be supported at least by a reasonable and articulable

suspicion that the person seized is engaged in criminal activity." <u>Reid v. Georgia</u>, 448

U.S. 438, 440, 100 S. Ct. 2752 (1980).  Lovejoy had no suspicion of criminal activity by

the plaintiff.  Rather, he maintains an anti-Second Amendment point of view that citizens

should not be allowed to open carry firearms anywhere near law enforcement officers.

As Judge Gregory noted in the <u>Black</u> opinion, "[w]here a state permits individuals to

openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states. Black at 540( *citing* United States v. King, 990 F.2d 1552, 1559 (10th Cir.1993).  As such, there was no probable cause to arrest the plaintiff for obstruction, as evidenced by the fact that the plaintiff was subsequently found not guilty following trial on that charge.

Defendants also argue that qualified immunity should apply, even if there was no probable cause, because "Defendants have located no prior ruling stating that a willful refusal to comply with a *Terry* frisk does not create a reasonable belief that West Virginia's Obstructing an Officer statute has been violated . . . ." (Def.'s Mem. at 10). Again, the defendants argue for qualified immunity under the false premise that a lawful Terry stop/seizure had occurred.  Again, the entire point of the plaintiff's lawsuit is that there was no basis for a Terry stop/seizure, because plaintiff was at all times a law-abiding citizen under no legitimate suspicion of criminal behavior.  He was arrested and harassed solely for open carrying a firearm - which is supposed to be legal in West Virginia.

The false arrest claim must go forward because there was no probable cause, as alleged in the complaint, which is assumed to be true for purposes of a motion to dismiss.  As Judge Gregory clearly wrote in the Black opinion when he chastised law enforcement for abusing Terry in this exact circumstance, police officers cannot engage in a Terry stop/seizure of an individual open-carrying a firearm in an open carry state, without some reasonable articulable suspicion of criminal wrongdoing.  The only other

14

circumstance would be if the subject was inside a vehicle subject to a traffic stop, which is inapplicable here.

MUNICIPAL LIABILITY / MONELL CLAIM

Defendants argue in support of dismissal solely on the training aspect of a Monell claim.  However, the allegations in the complaint are more broad than training alone, and certainly plausible enough to overcome a 12(b)(6) analysis.

A local government cannot be sued under 42 U.S.C. § 1983 for injuries caused by its employees or agents unless it is "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" that causes the injury. Monell v. Department of Social Services, 436 U.S. 658, 694 (1978). Further, "municipal liability under § 1983 may not be predicated solely upon a respondeat superior theory [and that] [l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal policy or custom." Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984) (*citations omitted*). "Because municipal liability results only when the municipality itself can be directly charged with fault for a constitutional violation, it results only when policy or custom as above defined is (1) fairly attributable to the municipality as its "own," and is (2) the "moving force" behind the particular constitutional violation. Spell v. McDaniel, 824 F.2d 1380, 1386–87 (4th Cir. 1987) (internal punctuation and citations omitted). Municipal policy or customs may be in the form of an official policy, or, more frequently, in "deficient programs of police training and supervision" or "failure...to put a stop to or correct a widespread pattern of unconstitutional conduct by policy officers." Id. at 1389 (quoting Judge Berger's

Memorandum Order in <u>Bumgarner v. Clendenin</u>, Case 5:16-cv-05963, December 15, 2016).

In the <u>Bumgarner</u> excessive force Section 1983 case, the Southern District of West Virginia found a similarly-pled Monell claim sufficient to withstand a motion to dismiss:

> The Plaintiff here has alleged that the Town of Alderson has adopted a written policy that permits officers to use violent physical force to overcome nonviolent, verbal resistance, to protect property, or to effect "other lawful objectives." (Compl. at ¶ 38.) In addition to the written policy, Mr. Bumgarner also alleges that three officers participated in and observed the use of force, that he was charged with brandishing a weapon and resisting arrest, and other drivers witnessed the events and provided testimony corroborating his account. The Court has fully analyzed the complaint with regard to excessive force in evaluating the officers' motion to dismiss, and further extensive discussion is not necessary here. Mr. Bumgarner alleges that he questioned Officer Clendenen's actions, and the three officers assaulted him when he posed no threat and offered no physical resistance. In short, it is plausible that a policy authorizing force to overcome non- violent or verbal resistance, or a catchall authorization to use force to accomplish lawful objectives, led to Mr. Bumgarner's injuries in this case. The Town of Alderson's motion to dismiss as to Count Three should therefore be denied.

(Judge Berger's Memorandum Order in <u>Bumgarner v. Clendenin</u>, Case 5:16-cv-05963, December 15, 2016 at 15-16).  That case was subsequently settled before trial.

Here, the plaintiff has alleged that the Putnam County Commission has an official policy, custom and practice of violating the rights of law-abiding citizens in West Virginia who are lawfully carrying, or in possession of a firearm (Compl. at paragraph 87), as evidenced by two separate seizures of the plaintiff over a year apart for lawfully open-carrying a firearm.  These incidents not only spanned over a year apart, but involved at least three different police officers employed by the Putnam County Commission. Additionally, plaintiff alleged that other incidents have occurred by PCC employees, according to the statement made by Defendant Donahoe captured on video footage

(Compl. at 89).  The complaint contains a legitimate and sufficient allegation of a political subdivision which has adopted a policy, custom and practice of violating open-carry rights.  Their official position is illustrated in their Partial Motion to Dismiss, wherein they feign ignorance of the Fourth Circuit's holding in United States v. Black, 707 F.3d 531 (4th Cir. 2013).  Plaintiff should not be deprived of the opportunity to engage in discovery in order to ask Defendant Donahoe and the PCC the identity of the other individuals whom rights have been violated, as admitted by Donahoe.  Clearly Putnam County has a legitimate issue with misuse of Terry, and as such the claim should proceed.

Defendants also argue that since they believe there are no underlying constitutional violations, that the Monell claim is unsupported.  Yet again the defendants are attempting to argue and weigh the facts in a motion to dismiss.  What's important under 12(b)(6) is that plaintiff has concisely and plainly stated a basis for Monell / Municipal liability by making appropriate allegations, including separate counts for the underlying constitutional violations.  Assuming plaintiff's allegations to be true, there were underlying constitutional violations, involving separate incidents and separate officers respectively utilizing the same violative policy.  Moreover, we have an admission by one of the officers, Donahoe, such violations are a common practice:

> Everybody in the world I deal with, that has a gun, I check and see whether they have committed a crime, that would keep them from carrying or to possess a gun.  If you have not, you can keep going down the road.

(Compl. at paragraph 37).  This admission was captured on video footage, which probably explains the lack of a motion to dismiss on behalf of Donahoe and Pauley.

As Judge Berger noted in the <u>Bumgarner</u> ruling, it is "plausible" that a policy authorizing the misuse of investigatory stops of law-abiding citizens who open carry exists in Putnam County, as alleged by the plaintiff, and that the policy led to the plaintiff's injuries in this case - on not one, but two separate occasions.  That is all that is required to move past the motion to dismiss stage, and plaintiff has certainly met that standard.

CONCLUSION

Neither Putnam County Commission, nor any of their employee police officers are legally entitled to establish their own policies of investigatory detentions of law-abiding citizens open carrying firearms which are in direct violation of established federal case law forbidding the same.  If there was no suspicion of criminal wrongdoing by the plaintiff on either occasion at issue, there could have been no justifiable <u>Terry</u> seizure.  If there was no justifiable <u>Terry</u> seizure, the plaintiff's claims must succeed. Since plaintiff's allegations are taken as true at the 12(b)(6) stage, the defendants motion to dismiss must be denied.

WHEREFORE, the plaintiff respectfully requests that the defendants' Partial Motion to Dismiss be denied, and for such other and further relief as the Court deems just and fit.

18

MICHAEL WALKER
By Counsel


/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
611 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

for the Plaintiff

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT HUNTINGTON**

MICHAEL WALKER, individually,

        Plaintiff,

vs.                        Civil Action No. : 3:18-cv-01523


M. H. LOVEJOY, in his individual capacity,
B.E. DONAHOE, in his individual capacity,
B.W. PAULEY, in his individual capacity,
PUTNAM COUNTY COMMISSION, a
political subdivision of the State of West
Virginia,

        Defendants.

## **CERTIFICATE OF SERVICE**

        I, John H. Bryan, do hereby certify that I have delivered a true copy of the

foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS' PARTIAL MOTION TO

DISMISS upon counsel of record by using the CM/ECF System, this the 21st day of

February, 2019, and addressed as follows:

John P. Fuller, Esq.
Charles R. Bailey, Esq.
Adam K. Strider, Esq.
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, WV 25337-3710

                                        _____/s John H. Bryan_____