# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

MICHAEL WALKER, individually,

        Plaintiff,

v.                                       CIVIL ACTION NO. 3:18-1523

M. H. LOVEJOY, in his individual capacity,
B. E. DONAHOE, in his individual capacity,
B. W. PAULEY, in his individual capacity,
PUTNAM COUNTY COMMISSION, a
political subdivision of the State of West Virginia,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is Defendants' Partial Motion to Dismiss. ECF No. 9. Defendants request the Court dismiss Counts One, Two, and Five of the five total counts in Plaintiff Michael Walker's Complaint. For the reasons below, the Court **GRANTS** the motion and **DISMISSES** Counts One, Two, and Five of the Complaint.

## BACKGROUND

Plaintiff filed his Complaint on December 17, 2018. ECF No. 1. The Complaint's five counts, brought under 42 U.S.C. § 1983, involve two separate incidents. Plaintiff alleges the following facts.

On or about December 18, 2016, Plaintiff was at his friend's house when a domestic dispute broke out between his friend and his friend's sibling. *Id*. at 2. The sibling called the police, and Deputy Lovejoy arrived at the house. *Id*. at 2–3. After approximately thirty to forty-five minutes, Deputy Lovejoy noticed Plaintiff was openly carrying a holstered pistol. *Id*. at 3. Deputy

Lovejoy then walked over to Plaintiff and said, "[l]ook at me you stupid son of a bitch, you're putting all of our damned lives at risk because you're carrying a gun." *Id*. Deputy Lovejoy attempted to confiscate the pistol, but Plaintiff refused and said he would leave the property instead. *Id*. Deputy Lovejoy stopped Plaintiff from leaving, stating he was concerned Plaintiff might sneak around and shoot at the deputies. *Id*. Deputy Lovejoy then confiscated Plaintiff's firearm, arrested him for obstruction, and took him to jail. *Id*. at 3–4. Based on this incident, Count One alleges Deputy Lovejoy unlawfully seized Plaintiff and confiscated his firearm, and Count Two alleges Deputy Lovejoy unlawfully arrested Plaintiff. *Id*. at 8–10.

Counts Three and Four arise from a separate incident on or about February 21, 2017. *Id*. at 10–14. Plaintiff alleges Deputies B. E. Donahoe and B. W. Pauley stopped Plaintiff while Plaintiff was walking on a public roadway and carrying an AR-15 rifle strapped to his backpack. *Id.* at 4. Deputy Donahoe demanded Plaintiff provide identification and then called in Plaintiff's information to run a criminal background check. *Id*. at 5. Plaintiff said he wanted to leave the encounter, but Deputy Donahoe told Plaintiff he could only leave when dismissed. *Id*. During their exchange, Deputy Donahoe allegedly told Plaintiff:

> Everybody in the world I deal with, that has a gun, I check and see whether they have committed a crime, that would keep them from carrying or to possess a gun. If you have not, you can keep going down the road. As for taking that in a store, or going in a store, I would highly advise against it.

*Id*. at 6. After criticizing Plaintiff's reticence to talk with law enforcement, Deputy Donahoe allowed Plaintiff to leave. *Id*. at 7. Based on this incident, Count Three alleges Deputy Donahoe unlawfully seized Plaintiff, and Count Four alleges Deputy Pauley is liable as a bystander to the unlawful seizure. *Id*. at 10–14. Count Five, based on both incidents, alleges the Putnam County Commission has an unlawful policy, custom, and practice of violating the rights of citizens who lawfully carry firearms. *Id*. at 14.

Defendants filed their Partial Motion to Dismiss on January 30, 2019. ECF No. 9. They argue the Court should dismiss Counts One and Two because no Fourth Amendment violations occurred, so qualified immunity applies to Deputy Lovejoy. ECF No. 10, at 4–10. Defendants argue the Court should dismiss Count Five because no unlawful policy, custom, and practice exists. *Id*. at 11–15. Plaintiff opposed the motion in a response, and Defendants filed a reply. ECF Nos. 11, 12.

**LEGAL STANDARD**

To survive a motion to dismiss, a plaintiff's complaint must contain "a short and plain statement of the claim showing [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The facts contained in the statement need not be probable, but the statement must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the plausibility of a plaintiff's claim, the Court must accept all factual allegations in the complaint as true. *Id.*

**DISCUSSION**

**I.      Count One: Unreasonable Search and Seizure in Violation of the Fourth Amendment on December 18, 2016**

Count One alleges two Fourth Amendment violations occurred on December 18, 2016. ECF No. 1, at 8–9. First, Plaintiff alleges Deputy Lovejoy unlawfully seized him. *Id.* Second, Plaintiff alleges Deputy Lovejoy unlawfully frisked him and confiscated his firearm. *Id.* Plaintiff argues Deputy Lovejoy had no authority to prevent him from leaving the house or to confiscate his firearm because Deputy Lovejoy had no reason to suspect Plaintiff of criminal activity. *Id.*

Defendants argue qualified immunity applies because Deputy Lovejoy did not violate the Fourth Amendment by seizing Plaintiff and confiscating his firearm. ECF No. 10, at 4–8.

Qualified immunity protects government officials from civil damages in § 1983 actions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted). The qualified immunity defense requires a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first question is whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Id.* If no violation occurred, the analysis ends, and the plaintiff cannot prevail. *Id.* If the Court finds a violation may have occurred, the Court must consider whether the constitutional right was "clearly established," meaning "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02 (citation omitted). The "clearly established" standard ensures officers are only liable "for transgressing bright lines" and not for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citations omitted); *e.g. Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016) (holding officers' use of stun gun violated the Fourth Amendment, but qualified immunity applied because the arrestee's right not to be tased was not clearly established). Because Count One alleges two Fourth Amendment violations, the Court examines them separately.

**A. Investigative Stop**

**(1) Whether a Constitutional Violation Occurred**

*Reasonable Suspicion*

The "touchstone" of any Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."

*Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *United States v. Black*, 707 F.3d 531, 539–40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. *Cortez*, 449 U.S. at 417–18.

Because the details of the encounter between Plaintiff and Deputy Lovejoy are sparse at this stage, the Court cannot conclude whether Deputy Lovejoy had reasonable suspicion to prevent Plaintiff from leaving the house. In support of finding reasonable suspicion is the fact that Deputy Lovejoy arrived at the house to respond to a potentially violent domestic dispute. ECF No. 1, at 2–3. Based on this call, an officer would have reason to believe "criminal activity [was] afoot" and those present were involved. *Wardlow*, 528 U.S. at 123. However, many relevant facts are absent from the Complaint. The Complaint contains no description of what dispatch told Deputy Lovejoy, if anything, about Plaintiff's involvement in the dispute. The Complaint also does not describe what transpired during the thirty to forty-five minutes Deputy Lovejoy was at the house speaking with Plaintiff. One can imagine different facts that could have heightened or eliminated suspicion of Plaintiff during this time. Plaintiff's argument that he was an "innocent bystander" is not an automatic escape from being subject to an investigative stop. *See United States v. Brown*, 398 Fed. Appx. 865, 867–69 (4th Cir. 2010) (finding officers had reasonable suspicion to detain a man standing near a drug transaction). Yet, the possibility remains that Plaintiff distanced himself

enough from the domestic dispute over the thirty to forty-five minutes to dispel any reasonable suspicion he was involved in criminal activity, and "[t]here is no reasonable suspicion merely by association." *Black*, 707 F.3d at 539. This evidentiary ambiguity prevents the Court from determining at this stage whether reasonable suspicion for the stop existed.

*Officer Safety*

Although individualized suspicion of criminal activity is the principal justification for warrantless seizures, a seizure may still be reasonable when "special governmental needs, beyond the normal need for law enforcement" justify the intrusion. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). One special need is responding to "exigent circumstances," where "the objective circumstances would lead a reasonable, experienced officer to believe an urgent need existed to act, particularly where the safety of the public or police are threatened." *United States v. Curry*, No. 18-4233, 2019 WL 4197489, at *6 (4th Cir. 2019) (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). If a court finds exigent circumstances or another special need exists, the court will determine the reasonableness of the seizure by weighing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979) (citation omitted).

The Fourth Circuit recently affirmed that, under *Brown*, officers can seize people not individually suspected of a crime if the concerns of public and officer safety are grave enough. *Curry*, 2019 WL 4197489, at *9. Even though officers did not have individualized suspicion, the court held in *United States v. Curry* that a flashlight search of several men's waistbands after officers heard gunshots was lawful under the Fourth Amendment. 2019 WL 4197489, at *9. The court found that the limited seizure was reasonable because it advanced the concerns of public and

officer safety and only minimally interfered with the men's liberty. *Id.* at *3–9. *Curry* exemplifies the commonsense proposition proclaimed in *Terry* that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23.

The encounter between Plaintiff and Deputy Lovejoy raises the same concerns of public and officer safety. Deputy Lovejoy explicitly stated his concern for safety was the reason he would not let Plaintiff leave. ECF No. 1, at 3. Before seizing Plaintiff, Deputy Lovejoy allegedly said to him, "you're putting all of our damned lives at risk because you're carrying a gun." *Id*. After Plaintiff refused to surrender the weapon, the Complaint states Deputy Lovejoy told Plaintiff he could not leave because he "might sneak around and start shooting at law enforcement." *Id*. These statements express a subjective, or perhaps only pretextual, concern for the Deputy's safety and the safety of others at the scene.

The issue for the Court is whether, regardless of Deputy Lovejoy's subjective beliefs, the encounter's objective circumstances would lead a reasonable, experienced officer to believe an urgent need existed to stop Plaintiff to keep the scene safe. *See Curry*, 2019 WL 4197489, at *6. The Complaint's lack of detail does not allow for this determination. Plaintiff characterizes the encounter as one of unjustified police aggression, in which the Deputy verbally demeaned Plaintiff and detained him under the pretext of safety without having any reason to feel threatened. ECF No. 11, at 8. But insufficient detail of the encounter's objective circumstances precludes the court from scrutinizing Plaintiff's characterization. *Curry*, 2019 WL 4197489, at *6. Especially significant is what transpired over the thirty to forty-five minutes Deputy Lovejoy was at the house before stopping Plaintiff, for the Complaint jumps immediately from Deputy Lovejoy arriving at the house to Deputy Lovejoy noticing Plaintiff's firearm. ECF No. 1, at 3. These details are necessary for the Court to determine whether a safety threat sufficient to trigger the exigent circumstances

doctrine existed.

*Detaining a Witness*

Another possible special need for Deputy Lovejoy's seizure of Plaintiff was the Deputy's need to obtain information from Plaintiff as a witness to the domestic dispute. The Supreme Court has upheld the detention of witnesses as reasonable under the Fourth Amendment in certain circumstances. For example, in *Illinois v. Lidster*, the Supreme Court affirmed the constitutionality of a checkpoint used to briefly detain motorists and ask them about a fatal hit-and-run accident. 540 U.S. 419, 427–28 (2004). Applying *Brown*, the Court found the public concern of investigating a person's death was grave, the brevity of each stop minimally interfered with drivers' liberty, and the stop provided little reason to cause drivers anxiety. *Id*. Subsequent cases addressing witnesses' detention similarly focus on the detention's duration, the severity of the crime being investigated, and the value of information known by the witness. *E.g. Lincoln v. Scott*, 887 F.3d 190, 196–97 (5th Cir. 2018) (holding four-hour detention of witness to a police shooting was not reasonable); *Walker v. City of Orem*, 451 F.3d 1139, 1148–50 (10th Cir. 2006) (holding ninety-minute detention of witnesses to a police shooting was not reasonable).

Like the issue of officer safety, the Complaint's lack of detail prevents the Court from determining whether the seizure of Plaintiff as a witness was reasonable under *Brown. See* 443 U.S. at 51. Preventing Plaintiff from leaving the house interfered with his liberty, but the "gravity of the public concerns served by the seizure" is unclear because the Complaint only describes the incident as a "domestic dispute." *Id.* Plaintiff does not describe the severity of the dispute, including whether the incident was violent or likely to escalate into violence. The Complaint also does not indicate what additional information Plaintiff could have provided by being detained. Because Deputy Lovejoy had already spoken with Plaintiff for thirty to forty-five minutes, it

seems unlikely that Plaintiff still held valuable information that would have significantly "advance[d] the public interest," but the lack of evidence at this stage precludes this conclusion. *Id*. Also relevant but missing from the Complaint is whether Plaintiff provided his contact information to Deputy Lovejoy, so the Deputy could follow up with Plaintiff later instead of detaining him at that moment. These factual gaps prevent the Court from determining whether seizing Plaintiff as a witness was reasonable under the Fourth Amendment.

### (2) Whether the Right is Clearly Established

Because the Court is unable to resolve whether a constitutional violation occurred, the Court proceeds to the second step of the qualified immunity analysis. The Court must determine whether Plaintiff's right to end his exchange with Deputy Lovejoy and leave the house was "clearly established," so "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201–02 (citation omitted).

As the prior discussion illustrates, the Fourth Amendment analysis here involves the delicate interplay of several murky issues, including suspicion of claimed bystanders, officer safety, the detention of witnesses, and the open carrying of firearms. The parties and the Court have found no precedent establishing "bright lines" in similar cases against which the Court can measure Deputy Lovejoy's possible transgression. *Maciariello*, 973 F.2d at 298 (citations omitted). Given the Court's inability to answer the question of constitutionality without applying the fact-intensive standard to a developed record, the Court cannot hold Plaintiff's right to leave was "clearly established." *Saucier*, 533 U.S. at 201–02 (citation omitted). At worst, Deputy Lovejoy made a "bad guess in a gray area," which is understandable for an officer concerned for his safety and thinking on his feet while resolving a domestic dispute. *Maciariello*, 973 F.2d at 298 (citations omitted). Therefore, qualified immunity applies.

### B. Weapons Frisk

Having found qualified immunity applies to Deputy Lovejoy for seizing Plaintiff, the Court now examines whether qualified immunity applies to Deputy Lovejoy for frisking Plaintiff and confiscating his firearm.

#### (1) Whether a Constitutional Violation Occurred

Once an officer has reasonable suspicion to stop a suspect, the officer may conduct a limited search for weapons if the officer reasonably believes the defendant may be armed and dangerous. *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (citing *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)). Being "dangerous" automatically follows from being "armed," for "the risk of danger is created simply because the person, who was forcibly stopped, is armed." *Id.* at 700. Whether the person lawfully carries the firearm is inconsequential because "[t]he danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession." *Id.* at 696 (citations omitted).

Because the Court cannot determine at this stage whether Plaintiff's seizure was constitutional absent qualified immunity, the Court also cannot determine whether the protective frisk was constitutional because a frisk requires a lawful seizure. *Robinson*, 846 F.3d at 698. Plaintiff does, however, satisfy the second element of being "armed and dangerous." *Id.* Plaintiff argues Deputy Lovejoy had no reason to believe Plaintiff was dangerous because Plaintiff was fifty feet away and never threatened the Deputy's safety. ECF No. 11, at 8. However, the likelihood of Plaintiff using the firearm against Deputy Lovejoy is irrelevant, as is whether Plaintiff lawfully carried the firearm. *See Robinson*, 846 F.3d at 700, 696. Just by virtue of carrying the pistol, Plaintiff was "armed and dangerous." *Id* at 698. Although Plaintiff meets the

"armed and dangerous" element, the question of whether the stop was lawful is inconclusive, so the Court must proceed to the next step of the qualified immunity analysis.

### (2) Whether the Right is Clearly Established

Because Plaintiff meets the "armed and dangerous" element, the only remaining issue is whether Plaintiff's right to end his exchange with Deputy Lovejoy and leave the house was "clearly established," so "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201–02 (citation omitted). The Court has already concluded this right is not clearly established in the previous discussion of the investigative stop. Therefore, the Court concludes the same for the weapons frisk. Qualified immunity applies, and the Court dismisses Count One.

## II. Count Two: False Arrest in Violation of the Fourth Amendment on December 18, 2016

Count Two alleges Deputy Lovejoy unlawfully arrested Plaintiff for obstruction after Plaintiff refused to surrender his firearm on December 18, 2016. ECF No. 1, at 9–10. Plaintiff argues no probable cause existed for Deputy Lovejoy to make the arrest. *Id.* Defendants argue Deputy Lovejoy had probable cause because Plaintiff refused to submit to a lawful frisk and surrender the firearm. ECF No. 10, at 8–10. Even if the Court determines probable cause did not exist, Defendants argue the Court must still apply qualified immunity because Deputy Lovejoy reasonably believed noncompliance with a weapons frisk violated West Virginia's obstruction statute. *Id.* at 10.

### A. Whether a Constitutional Violation Occurred

The Fourth Amendment permits a warrantless arrest when an officer has probable cause to believe the arrestee committed a minor crime in the officer's presence. *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (citations omitted). Probable cause means the officer knows enough facts and

circumstances to warrant "a prudent person, or one of reasonable caution," in believing the suspect committed an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (citations omitted). The backstops of prudence and reasonableness prevent an officer's forced choice "between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Pierson v. Ray*, 386 U.S. 547, 555 (1967). A later acquittal is irrelevant to the validity of an arrest. *DeFillippo*, 443 U.S. at 36.

Deputy Lovejoy arrested Plaintiff for obstruction after Plaintiff refused to surrender his firearm. ECF No. 1, at 3–4. Under West Virginia law:

> A person who by threats, menaces, acts, or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer . . . acting in his or her official capacity is guilty of a misdemeanor . . . .

W. Va. Code, § 61-5-17(a). There is no dispute Deputy Lovejoy acted in his official capacity or that Plaintiff refused to hand over his firearm. ECF No. 1, at 3. The only question is whether "a prudent [law enforcement officer], or one of reasonable caution" could have believed he had the authority to confiscate Plaintiff's firearm and arrest Plaintiff for his refusal. *DeFillippo*, 443 U.S. at 37.

As discussed with respect to Count One, Deputy Lovejoy's encounter with Plaintiff involves the complicated issues of suspicion of claimed bystanders, officer safety, the detention of witnesses, and the open carrying of firearms. The legal gray area of the encounter, devoid of "bright lines," renders Deputy Lovejoy's stop and frisk of Plaintiff lawful. *Maciariello*, 973 F.2d at 298 (citations omitted). Based on the same facts, an officer in Deputy Lovejoy's position could reasonably believe Plaintiff's refusal to hand over his firearm constituted obstruction. Courts have held that similar refusals to follow officers' orders warrant the belief that an individual committed obstruction. For example, the Supreme Court of Appeals of West Virginia held in *City of St.*

*Albans v. Botkins* that an officer could reasonably believe that a suspect's refusal to fall to the ground when ordered was obstruction. 228 W. Va. 393, 402 (W. Va. 2011). This Court similarly held in *United States v. Wallace* that an officer could reasonably believe a suspect committed obstruction by physically resisting an investigative stop. 811 F. Supp. 2d 1265, 1273–74 (S.D. W. Va. 2011). Defendant mentions several times that a jury acquitted Plaintiff of obstruction, but the acquittal is irrelevant to evaluating the validity of his arrest. *See DeFillippo*, 443 U.S. at 36. The Court, therefore, finds Deputy Lovejoy's arrest of Plaintiff did not violate the Fourth Amendment. Qualified immunity applies, and the Court dismisses Count Two.

### III. Count Five: Municipal Liability under 42 U.S.C. § 1983 for the Occurrences on December 18, 2016, and February 21, 2017

Count Five alleges the Putnam County Commission has an official policy, custom, and practice of violating West Virginians' right to possess and carry firearms. ECF No. 1, at 14. As support, Plaintiff cites the incidents on December 18, 2016, and February 21, 2017, as well as an alleged admission by Deputy Donahoe that he seizes every individual he sees with a firearm regardless of whether he suspects them of a crime. *Id.* Defendants argue no constitutional violations occurred and that these incidents only involve individuals' conduct, not county policy. ECF No. 10, at 11–15.

A local government is liable under § 1983 when a policy or custom is "the moving force" behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiffs must show that an official policy or custom is attributable to the government and that the policy proximately caused the deprivation of their rights. *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citation omitted). A "policy" is "a course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). In addition to official policies, liability can result from "deficient programs of police training and

supervision" and "failure . . . to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

Plaintiff's *Monell* claim rests primarily on Deputy Donahoe's alleged admission of routine Fourth Amendment violations, but even the most liberal reading of his statement does not support county liability. As a preliminary issue, it is debatable whether the Deputy actually described anything unconstitutional. According to Plaintiff, Deputy Donahoe stated:

> Everybody in the world I deal with, that has a gun, I check and see whether they have committed a crime, that would keep them from carrying or to possess a gun. If you have not, you can keep going down the road. As for taking that in a store, or going in a store, I would highly advise against it.

ECF No. 1, at 6. To whom Deputy Donahoe refers to "deal[ing] with" is unclear. He may be referring to people he lawfully stops under *Terry*, in which case there is no constitutional violation. *See United States v. Black*, 707 F.3d 531, 539–40 (holding an officer can stop a person carrying a firearm in an open-carry state when the officer has reasonable suspicion). The interpretation most favorable to Plaintiff is that Deputy Donahoe is referring to any person he interacts with who has a gun, in which case stopping the person and performing a background check without reasonable suspicion would be unconstitutional. *See id*.

Even if the Court construes Deputy Donahoe's statement in Plaintiff's favor to mean that Deputy Donahoe routinely and unlawfully stops and performs background checks on people not suspected of a crime, the statement does not support a *Monell* claim. By using three different "I" statements, Deputy Donahoe refers only to his conduct. ECF No. 1, at 6. He does not mention any policy, training, or endorsement that links his conduct to the county. He also does not use "we" statements to include his partner present at the scene, which might support the claim that the conduct goes beyond Deputy Donahoe's personal practice. As is, the statement establishes no link

between the Deputy's conduct and county policy, and Deputy Donahoe's later statements to Plaintiff fail to support a *Monell* claim for the same reasons. *See id.* at 7.

The only other facts Plaintiff raises to support his *Monell* claim are the incidents on December 18, 2016, and February 21, 2017, which Plaintiff argues indicate a guiding policy of violating West Virginian gun owners' rights. ECF No. 1, at 14. However, these incidents are too different to suggest an underlying policy. On December 18, 2016, Deputy Lovejoy requested Plaintiff temporarily surrender his firearm until the Deputy completed his investigation of the domestic dispute. *Id.* at 2–4. Deputy Lovejoy did not challenge the legality of Plaintiff's firearm possession. In contrast, the incident on February 21, 2017, centers on Deputy Donahoe confirming Plaintiff's lawful possession of the firearm. *Id.* at 4–7. The different natures of these encounters make it difficult to conceive of a policy that would guide them both, and the best Plaintiff does is allege a sweeping, ambiguous policy of "violating the rights of law-abiding citizens in West Virginia who are lawfully carrying, or in possession of a firearm." *Id.* at 14. Without anything more to link these incidents together or to the Putnam County Commission, they do not support a *Monell* claim. The Court therefore must dismiss Count Five.

## CONCLUSION

The Court **GRANTS** Defendants' Partial Motion to Dismiss, ECF No. 9, and **DISMISSES** Counts One, Two, and Five of Plaintiff's Complaint, ECF No. 1. Plaintiff may proceed on the remaining counts. The Court **DIRECTS** the Clerk to send a copy of this opinion and order to counsel of record and any unrepresented parties.

ENTER: September 27, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE