IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**MICHAEL WALKER, individually,**

    **Plaintiff,**

**v.**
                                    **Civil Action No. 3:18-cv-01523**
                                      **Honorable Robert C. Chambers**

**M.H. LOVEJOY, in his individual capacity;**
**B.E. DONAHOE, in his individual capacity;**
**B.W. PAULEY, in his individual capacity;**
**PUTMAN COUNTY COMMISSION, a**
**political subdivision of the State of West**
**Virginia,**

    **Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

**COME NOW** the Defendants, Corporal Brian E. Donohoe ("Cpl. Donohoe") and Deputy

Brandon W. Pauley ("Dep. Pauley"), by counsel Charles R. Bailey, Adam K. Strider, and the law

firm of Bailey & Wyant, PLLC, and hereby submit for this Honorable Court's consideration the

following Memorandum of Law in support of their contemporaneously-filed Motion for Summary

Judgment.

## I.  STATEMENT OF FACT

Plaintiff Michael Walker's claims arise from a brief investigatory stop on or about February

21, 2018, by these Defendants.  The Plaintiff was stopped due to a 9-1-1 call which reported an

individual walking down the side of Route 33 between the Rocky Step area and the Route 35

intersection, in Scott Depot, Putnam County, West Virginia, carrying an AR-15 style rifle.  Exhibit 1,

*Depo. of Brian Donohoe*, Pg. 6, Lines 18-21; Pg. Pg. 22, Lines 1-7; see also Exhibit 2, *Depo. of*

1

*Brandon Pauley*, Pg. 6, Line 17 – Pg. 7, Line 2.  As a result of that stop, Mr. Walker has pled a 42 U.S.C. § 1983 claim for unlawful search and seizure under the 4th Amendment to the United States Constitution against Cpl. Donohoe, as well as a companion 42 U.S.C. § 1983 claim for bystander liability against Dep. Pauley.

Mr. Walker was born January 11, 1994, making him twenty-four (24) years old at the time of the stop.  Exhibit 3, *Depo. of Michael Walker*, Pg. 6, Lines 20-21.  Mr. Walker testified that on the date in question, he was walking to a friend's house to go hunting for coyotes.  *Id*. at Pg. 22, Lines 10-21.  Mr. Walker walked because his epilepsy prevents him from driving.  *Id*. at Pg. 10, Line 14.  In doing so, Mr. Walker walked along the side of Route 33, known as "Teays Valley Road," in Scott Depot, Putnam County, West Virginia, with an AR-15-style rifle slung across his back.  *Depo. of Brandon Pauley*, Pg. 6, Line 17 – Pg. 7, Line 2; Pg. 7, Lines 10-15.

The first notice the Defendants received of Mr. Walker's actions was a 9-1-1 call, reporting that a person was walking down Route 33 toward Route 35 carrying an "AR-15" or "assault rifle." *Id*.  Dep. Pauley and Cpl. Donohoe responded to the call.  Dep. Pauley arrived first, and observed Mr. Walker walking westbound on Route 33.  Dep. Pauley got Mr. Walker's attention and asked him to step into a driveway, with which he complied.  Cpl. Donohoe then arrived, and Dep. Pauley allowed the more senior and experienced officer to handle the interaction.  See *Depo. of Brandon Pauley* at Pg. 9, Line 21 – Pg. 10, Line 9.  Dep. Pauley began his law enforcement career in April of 2017, having less than one year of law enforcement experience at the time.  *Id*. at Pg. 5, Lines 10-19. By contrast, Cpl. Donohoe was a career law enforcement officer with over twenty (20) years of experience.  *Depo. of Brian Donohoe*, Pg. 5, Lines 8-12.

Both officers testified to their concerns that led them to stop Mr. Walker, and led Cpl. Donohoe to request his identification.  Being familiar with the area, both officers knew that Mr.

2

Walker was within walking distance of Teays Valley Christian School, and was walking in the direction of the school.1 *Depo. of Brandon Pauley*, Pg. 16, Lines 12-20; *Depo. of Brian Donohoe*, Pg. 22, Lines 1-16; *Depo. of Michael Walker*, Pg. 31, Lines 7-10.  This encounter took place on the morning of February 21, 2018, seven (7) days after the well-known, nationally-covered school shooting at Marjory Stoneman Douglas High School in Parkland, Florida, which resulted in the murder of seventeen (17) students and faculty, and the wounding of fourteen (14) more persons, by a gunman with an AR-15 style rifle.2 *Depo. of Brandon Pauley*, Pg. 16, Lines 21-23; *Depo. of Brian Donohoe*, Pg. 22, Lines 17-21.  February 21, 2018 was a Wednesday, and school was in session. Both officers testified that in the aftermath of a major, nationally-known crime such as that, they are on heightened alert for potential copycat crimes.

> Q. When you were -- When you received the call about his location, were you familiar with that area?
>
> A. Yes, sir.
>
> Q. Did you know that area to be less than a mile away from Teays Valley Christian School?
>
> A. Yes, sir.
>
> Q. When you arrived, was he walking in the direction of the school?
>
> A. Yes, sir.
>
> Q. Did this interaction occur less than a week after the shooting in Parkland, Florida?
>
> A. Yes, sir.
>
> Q. Would you say that after a nationally significant, major crime like that you're on a

---

1 The Defendants ask that the Court take judicial notice that Teays Valley Christian School is a private K-12 school, located at 6562 Teays Valley Road, Scott Depot, Putnam County, West Virginia.  It is located at the intersection of Route 33 and Route 35.

2 See, e.g., Chuck, Elizabeth, Alex Johnson and Corky Siemaszko, *17 killed in mass shooting at high school in Parkland, Florida*, NBC News Online, (Feb. 14, 2018, 3:18 PM), https://www.nbcnews.com/news/us-news/police-respond-shooting-parkland-florida-high-school-n848101

heightened alert for copycats?

A. Yes, sir. Especially the Parkland shooting.

Q. Did that -- Did that affect your belief as to whether a crime was about to be committed?

A. Yes, sir.

*Depo. of Brandon Pauley*, Pg. 16, Line 11 – Pg. 17, Line 7.

Q. When you received the call on February 21st, 2018 regarding the -- regarding a person walking down the road with an assault rifle on their back, did the call specify where exactly that person was?

A. Yeah. They were walking between Rocky Step and Route 35 Interchange, walking towards the Route 35 Interchange.

Q. And are you familiar with that area?

A. Yes, sir.

Q. Were you familiar with that area at the time?

A. Yes, sir.

Q. Did you know there to be a school in that area?

A. Yes, sir.

Q. And when you observed Mr. Walker, was he traveling in the direction of that school?

A. Yes, sir.

Q. And you testified earlier that you were aware at the time that less than a week prior the -- there was a nationally-covered mass shooting in a school in Parkland, Florida?

A. Correct.

Q. And in the immediate after- -- or the days immediately following an event like that, are you on a heightened alert for copycat crimes?

A. Yes, sir.

Q. Was your heightened alert for copycat crimes of the Parkland shooting a factor, again, in your concern about Mr. Walker?

A. Yes, sir.

*Depo. of Brain Donohoe*, Pg. 22, Line 1 – Pg. 23, Line 5.

Second, both officers observed that Mr. Walker's youthful appearance, and that he possibly was under the age of eighteen (18). This belief was bolstered by the fact that Mr. Walker was walking rather than driving, further hinting at youthfulness. The carrying of firearms by persons under the age of eighteen (18) is a misdemeanor under West Virginia law. See W. Va. Code § 61-7-8.

Q. Did you, based on Mr. Walker's outward appearance, have a reasonable suspicion at the time that he may be under the age of 18?

A. Yes, sir.

[…]

Q. Was the fact that Mr. Walker was walking and not driving -- did that affect your belief about what his age might be?

A. Yes.

Q. Does someone who is walking and not driving suggest that they might be under age?

A. Yes.

*Depo. of Brandon Pauley*, Pg. 17, Line 22 – Pg. 18, Line 4; Pg. 23, Line 23 – Pg. 24, Line 2.

Q. Did you know Mr. Walker's age when you observed him?

A. No, sir.

Q. Did you believe there to be a possibility he could be under the age of 18?

A. Possible.

*Depo. of Brian Donohoe*, Pg. 23, Lines 6-11.

When Cpl. Donohoe arrived, he perceived Mr. Walker to be ignoring Dep. Pauley by continuing to walk down the road.  *Id*. at Pg. 7, Lines 7-15.  Consequently, Cpl. Donohoe then got Mr. Walker's attention and asked who he was and asked if he had identification.  *Id*. at Pg. 10, Lines 6-12.  The officers perceived Mr. Walker to be striking a defiant tone with Cpl. Donohoe, and heated words were exchanged between them.  *Depo. of Brandon Pauley*, Pg. 11, Line 24 – Pg. 12, Line 17.  Mr. Walker initially refused to provide his ID, claiming he didn't have to, but eventually relented.  *Depo. of Brandon Pauley*, Pg. 11, Line 24 – Pg. 12, Line 23; *Depo. of Brian Donohoe*, Pg. 10, Lines 1-15.  The identification showed that Mr. Walker was over the age of eighteen (18).  *Depo. of Brian Donohoe*, Pg. 23, Lines 12-18.  Cpl. Donohoe then called in a background check on Mr. Walker's ID, which discovered that he was not a person prohibited from possessing a firearm.  *Id*. at Pg. 23, Lines 19-22.

At this point, the officers believed that there was nothing they could legally do to prevent Mr. Walker from continuing the direction he was headed with his firearm, and Mr. Walker was permitted to leave.  *Depo. of Brian Donohoe*, Pg. 24, Line 10 – Pg. 25, Line 3.  He was not arrested or injured, and the entire interaction lasted approximately eight (8) minutes and forty-eight (48) seconds.  *Depo. of Michael Walker*, Pg. 27, Lines 2-5; Pg. 30, Lines 6-12; Pg. 36, Lines 12-14.

Mr. Walker has brought the instant claims, alleging that the stop and ID check were a violation of his Fourth Amendment rights.  The Defendants now move for Summary Judgment, based on the foregoing.

## II.  STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). Moreover, the rule also provides, in relevant part, as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).  In discussing this standard, the U.S. Supreme Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting

Fed. R. Civ. P. 56(c)).

"In assessing a motion for summary judgment all justifiable inferences must be drawn in

favor of the nonmoving party for 'credibility determinations, the weighing of evidence, and the

drawing of legitimate inferences from the facts.'" *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986)). Hence, "the court 'must perform a dual inquiry into the genuineness and materiality of any

purported factual issues.'" *Drewitt* at 778 (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d

355, 364 (4th Cir. 1985)).

The substantive law identifies facts that are material. Consequently, "only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson* at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross* at 364. Therefore, in reviewing the evidence, a judge must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson* at 252. If no genuine issue of material fact exists, the Court has an obligation "to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex* at 323-24).

Finally, when a party's "state of mind" is a decisive element of a claim or defense, summary judgment is seldom appropriate because "state of mind" determinations usually depend on the credibility of witnesses or the resolution of conflicting inferences drawn from circumstantial or self-serving evidence. *Thacker v. Peak*, 800 F. Supp. 372, 376 (S.D.W.Va. 1992) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) and *Ross* at 364)). Nevertheless, even if motive is material, summary judgment is not precluded if the claim rests solely on unsupported allegations. *Id.* (citing *Ross* at 365).

### III. ARGUMENTS

### A.  Statement of the law on qualified immunity.

Under the doctrine of qualified immunity, law enforcement officers performing discretionary duties "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified

immunity protects government officials from civil damages in § 1983 actions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* at 818 (internal citations omitted).

The qualified immunity defense requires a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first question is whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Id*. If no violation occurred, the analysis ends, and the plaintiff cannot prevail. See *id*. If the Court finds a violation may have occurred, the Court must consider whether the constitutional right was "clearly established," meaning "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 201–02 (citation omitted). The "clearly established" standard ensures officers are only liable "for transgressing bright lines" and not for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (internal citations omitted); see also *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016) (holding officers' conduct violated the Fourth Amendment, but qualified immunity applied because the right at issue was not clearly established).

**B. The Defendants' conduct did not violate any constitutional right of the Plaintiff, because the brief investigatory stop of the Plaintiff was premised upon reasonable suspicion.**

The first prong of the qualified immunity inquiry is unmet, because it is readily apparent from the record of the case taken as a whole that no constitutional violation occurred in stopping Mr. Walker.  The involved officers had adequate reasonable suspicion of criminal activity, rendering the brief, eight (8) minute and forty-eight (48) second stop and attendant identification check legal and free of Fourth Amendment violations.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  This Court expounded on the legal framework governing the relevant Fourth Amendment analyses in a prior Order in this matter, as follows:

> The "touchstone" of any Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *United States v. Black*, 707 F.3d 531, 539-40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. *Cortez*, 449 U.S. at 417-18.

*Walker v. Lovejoy*, CIVIL ACTION NO. 3:18-1523, 2019 U.S. Dist. LEXIS 166458, 2019 WL 4741709, *6-*7 (S.D.W.Va., Sept. 27, 2019).

The question here is not whether the open carrying of firearms, in and of itself, gives rise to a suspicion of criminal activity, but whether, taken as a whole, the totality of the circumstances give rise to a reasonable suspicion sufficient to justify a stop and short identification inspection.  This question has been posed by the United States Supreme Court as follows:

> The reasonable-suspicion standard is a derivation of the probable-cause command, applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, ***to prevent imminent crimes***, and to protect law enforcement officers in highly charged situations.

*United States v. Sokolow*, 490 U.S. 1, 12, 109 S.Ct. 1581, 104 L. Ed. 2d 1 (1989) (Emphasis added).

The reasonable suspicion standard necessary to justify a minimal intrusion such as a brief investigatory stop is an objective one which does not depend on the officers' subjective belief.

> Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the officer] to determine whether he thought the facts constituted reasonable suspicion. Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.

*United States v. Foreman*, 369 F.3d 776, 781-782 (4th Cir. 2004).

Even in the absence of individualized suspicion of criminal activity, an action may still be reasonable when "special governmental needs, beyond the normal need for law enforcement" justify the search. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) (noting the "longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness"). This is because "the Fourth Amendment imposes no irreducible requirement of such suspicion." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.8, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-561, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976)). "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 624, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989).

In this case, the officers who stopped Mr. Walker had a sufficient basis for individualized reasonable suspicion that Mr. Walker was in the process of committing an imminent criminal offense at the time he was stopped. The totality of the circumstances under which Mr. Walker was stopped –

a youthful person observed in walking distance of a school, walking in the direction of that school, carrying an AR-15 style rifle, seven (7) days after a major school shooting which saturated the national media at the time – certainly give rise to sufficient reasonable suspicion to justify a brief investigatory stop and identification check.

A similar situation was addressed by the U.S. District Court for the Middle District of Pennsylvania in *Banks v. Gallagher*, 686 F.Supp.2d 499 (M. D. Pa. 2009). In *Banks*, a group of several armed persons, some openly carrying firearms and some carrying concealed firearms, entered the "Old Country Buffet," a restaurant in Dickson City, Pennsylvania. See *id*. at 513. Several restaurant patrons, unnerved by the situation, called 9-1-1. See *id*. When law enforcement arrived, they approached the plaintiff, as with the other armed persons. See *id*. They asked for his identification, which the plaintiff interpreted as a demand, and he complied. See *id*. The police then ran his ID, and returned it to him. See *id*. Just as in this case, Pennsylvania is an open carry state, and the plaintiff therein alleged that the facial legality of carrying firearms rendered the alleged search unlawful. See *id*. at 512, 523.

The Court held that the totality of the circumstances gave rise to the requisite reasonable suspicion to justify the minimal intrusion of a brief stop and an identification check, as the context of a large number of armed persons coming into a restaurant together is an objectively novel and alarming set of circumstances, even though none of the individuals had committed an obvious crime by doing so. See *id*. at 523-524. The facial legality of the conduct is not central to the analysis.

> Thus, the question here is not whether an individual in certain jurisdictions of Pennsylvania may legally openly carry firearms. It is not contested by the Individual Defendants (for purposes of this Motion) that such conduct is legal. Rather, the question is whether a police officer has a reasonable suspicion, justifying a stop and a short-lived inspection of a person's driver's license, when they are confronted by a significant number of people exercising their open carry rights in a novel or unexpected way, at an unexpected time and place.

*Id.*  In so holding, the Court noted that "[t]here are any number of activities, legal in themselves, but taken collectively may pose risks and dangers (to the public and to officers on the scene) and thereby generate a reasonable suspicion to justify what would otherwise be a Fourth Amendment invasion." *Id.*

This holding is consistent with several other Courts which have addressed the question.  In *Baker v. Schwarb*, 40 F.Supp.3d 881 (E. D. Mich. 2014), the Eastern District of Michigan held that "[the plaintiff's] all-black garb and ominous rifle… coupled with his proximity to a hospital was sufficiently unusual for a law-abiding citizen to warrant a degree of alarm for the safety of people nearby."  *Id*. at 889.  Likewise, in *Deffert v. Moe*, 111 F.Supp.3d 797 (W. D. Mich. 2015), the Western District of Michigan held that law enforcement had reasonable suspicion for an investigatory stop of the plaintiff who was "walking in a residential neighborhood across the street from a church in service on a Sunday morning… wearing camouflage pants and an FNP-45 Tactical pistol secured in a leg holster" and loudly singing.  *Id*. at 809.  Further, in *Embody v. Ward*, 695 F.3d 577 (6th Cir. 2012), the Sixth Circuit held a Tennessee park ranger justified in an investigatory detention of a person walking through a state park "in camouflage carrying an AK-47 across his chest" to determine the legality of the weapon.  *Id*. at 580.

This case presents a scenario in the same lineage of the above-cited cases.  Mr. Walker was walking down the side of a road, travelling toward a school that was then in session, carrying an AR-15 style rifle.  Any casual observer of the news at any point in the past decade, much more a police officer charged with the public peace, would be rightfully alarmed and concerned for the public safety at the sight of a person who appeared to be headed toward a school with a firearm.  In actuality, Mr. Walker was not on his way to Teays Valley Christian School to commit a violent

13

crime.  However, "the constitutional question is whether the officers had reasonable suspicion of a crime, not whether a crime occurred.  Otherwise, all failed investigatory stops would lead to successful § 1983 actions."  *Embody* at 581.  Under the line of cases discussed herein, the totality of the circumstances of what Dep. Pauley and Cpl. Donohoe observed, as stated above, give rise to a reasonable suspicion sufficient to justify a brief investigatory stop of Mr. Walker to determine his identity, intentions, and whether his firearm was lawfully possessed.

Second, the officers had reasonable suspicion that Mr. Walker may have been in violation of W. Va. Code § 61-7-8, which prohibits the carrying of deadly weapons by persons under the age of eighteen (18).  At the time of the stop, Mr. Walker was twenty-four (24) years old.  Both Cpl. Donohoe and Dep. Pauley testified that, based on their observations of his appearance, they believed it possible that he could have been under the age of (18) eighteen.  This suspicion was heightened by the fact that Mr. Walker was not driving, which raises further inference of youthfulness.  While Plaintiff's counsel raised the fact that Mr. Walker has a beard during his deposition, facial hair is not uncommon among teenagers, and Mr. Walker conceded that he is routinely asked to show identification when he purchases tobacco products.  *Depo. of Michael Walker* at Pg. 45, Lines 1-5.  Thus, under a test for objective reasonableness, the officers were additionally justified in stopping Mr. Walker on reasonable suspicion of a violation of W. Va. Code § 61-7-8.

This case can be analogized to the holding in *Combs v. City of Birmingham*, Case No. 12-14528, 2013 U.S. Dist. LEXIS 124335, 2013 WL 4670699 (E. D. Mich., Aug. 30, 2013).  The *Combs* plaintiff was eighteen (18) years old and openly carrying a rifle across his back when he was stopped by law enforcement and requested to provide his identification due to his youthful appearance.  See *id*. at *5-*7.  The *Combs* plaintiff insisted he was of legal age, but defiantly refused to provide identification, claiming that he was not required to.  See *id*. at *5.  While a subsequent

search of his person uncovered his driver's license which showed him to be eighteen (18), he was nonetheless arrested for several charges, including obstructing a police officer. See *id*. at *6. The Court granted summary judgment to the officers as to the plaintiff's subsequent § 1983 claim, holding that there was probable cause to arrest the plaintiff for obstruction, because he had refused the officers' "lawful command" that he produce proof of his age. *Id*. at *22-*23. In so holding, the *Combs* Court relied in part on *Klaucke v. Daly*, 595 F.3d 20 (1st Cir. 2010), wherein the First Circuit held that an officer's demand to see the driver's license of a person suspected of underage possession of alcohol was reasonable, and that the officer was not required to accept the person's word that they were over twenty-one (21). See *id*. at 25. Likewise, Cpl. Donohoe was justified by his belief that there was a possibility Mr. Walker could be underage to request identification and verify the same.

As discussed herein, the facts preceding the officers' interaction with Mr. Walker give rise to two separate but independently sufficient objective reasonable suspicions justifying a brief investigatory stop. Whether based on the unusual and alarming circumstances of Mr. Walker approaching a school with an assault rifle, or to determine that he was of lawful age to carry a firearm, it is apparent from the record of this case that Dep. Pauley and Cpl. Donohoe did not violate the Fourth Amendment in stopping Mr. Walker.

### C. No constitutional violation occurred because the officers engaged in a legal community caretaking function.

The community caretaker function is a recognized exception to the Fourth Amendment. *U.S. v. Pollard*, 595 Fed. Appx. 204, 206 (4th Cir.2014) (holding that officers approaching a stopped vehicle does not implicate Fourth Amendment because officers acting in a community caretaking capacity); *U.S. v. Brown*, 447 Fed. Appx. 706, 710 (6th Cir.2012); ("No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions.");

*Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408 (1978) ("the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943 (2006) ("One exigency obviating the requirement of a warrant is the need to assist the persons who are seriously injured or threatened with such injury."); *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir.2008);  *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir.2006).

The community caretaking function of the police may come into play when there is a risk of danger to the police or others, and may, therefore, be properly classified as an example of exigent circumstances. See *Ziegler* at 785.  Community caretaking functions include stopping or seizing a citizen for his own safety and/or the safety of others, regardless of the officers' suspicion of criminal activity or lack thereof. See *U.S. v. King*, 990 F.3d 1552, 1560 (10th Cir. 1993) ("In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person ... in order to ensure the safety of the public and/or the individual, ***regardless of any suspected criminal activity.***) (Emphasis added).  Thus, this exception allows an officer "to detain individuals to prevent them from harming themselves or others." *Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir.2006) (citing *King* at 1560); see also *U.S. v. Rodriguez-Morales*, 929 F.2d 780, 784-785 (1st Cir. 1991) ("In performing this community caretaking role, police are expected to aid those in distress, combat actual hazards, ***prevent potential hazards from materializing*** and provide an infinite variety of services to preserve and protect public safety.") (Emphasis added); *U.S. v. Nord*, 586 F.2d 1288, 1290 (8th Cir.1978) (routine community caretaking functions of police include "responding to calls to assist persons in need of immediate aid").

In this case, even we were to assume that the officers' stopping of Mr. Walker, and Cpl. Donohoe's subsequent conducting of an identification check were conducted without reasonable

suspicion, they are still legal as a valid exercise of the community caretaking function.  It is beyond reasonable dispute, especially in our present era of widely-publicized public gun violence, that a brief investigatory stop of an individual who appears to be headed toward a school with a firearm is a valid attempt to "prevent potential hazards from materializing" and "ensure the safety of the public."  See *King* at 1560; *Rodriguez-Morales* at 784-785.  The Court in *Deffert v. Moe*, 111 F.Supp.3d 797 (W. D. Mich. 2015), cited *supra*, agreed in the case of the officer who stopped and detained Mr. Deffert for investigatory purposes when he was observed carrying a tactical pistol outside a church in service.  See *supra* pgs. 12-13; see also *Deffert* at 806-808.  In addition to finding that the investigatory stop and detention was a valid *Terry* stop, the Court also found it to be a valid community caretaking function.  See *Deffert* at 806-808.

As effectively summed up by the U.S. District Court for the Eastern District of Michigan in *Baker v. Smiscik*, 49 F.Supp.3d 489 (E. D. Mich. 2014), to prevent the "recurrent tragedies triggered by gun violence in public places, … police are properly given sufficient freedom of action to investigate circumstances that reasonably suggest an immediate risk to officer or public safety."  *Id.* at 498.  Put another way, if our culture is to be in any way empowered to protect itself from indiscriminate public gun violence, law enforcement must have leeway to, at least in some minor and non-intrusive way, intervene with an armed individual at some point before they pull the trigger. That is just what Cpl. Donohoe and Dep. Pauley did when they briefly stopped an individual who appeared to be headed toward a school with an AR-15 style rifle, a mere seven (7) days after one of the most infamous school shootings in history.  Thus, their acts constituted a valid community caretaking function, and no Fourth Amendment violations occurred.

**D. Even if a constitutional violation did occur, it was not a violation of a clearly established right which would be clear to a reasonable officer.**

Even in the event that a constitutional violation did occur as a result of the conduct described herein, the officers are nonetheless entitled to qualified immunity, because it would not be a violation of a clearly established right of which a reasonable officer would have known.  In the language of the *Maciariello* Court, they did not transgress a "bright line."

Governmental officials performing discretionary functions are shielded from liability for money damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Moreover, "there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Tarantino v. Baker*, 825 F.2d 772, 774-75 (4th Cir. 1987), *cert. denied*, 489 U.S. 1010, 103 L. Ed. 2d 180, 109 S. Ct. 1117 (1989)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc).

It is not sufficient that a right be clearly established in an abstract sense; it must be clearly established in its particularized application.

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless that very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Maciariello* at  298 (quoting *Anderson* at 639-640).  Applicable to the instant matter, this means that

it would be improper to state that a clearly established right of Mr. Walker's was violated merely

because the 4th Amendment and the legality of openly carrying firearms are clearly established.

Such an interpretation of qualified immunity "would bear no relationship to the 'objective legal

reasonableness' that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of

qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply

by alleging violation of extremely abstract rights."  *Id*.

      The law surrounding the intersection of the open carrying of deadly weapons and the Fourth

Amendment is developing.  Our review of controlling case law did not provide clear guidance, and,

as cited above, persuasive case precedent in fact suggests that Cpl. Donohoe's conduct in stopping

Mr. Walker and checking his identification was legal, either as a valid investigatory stop or a

community caretaking function, in light of the totality of the circumstances.  No statutory or case law

to date has clearly established Mr. Walker's right to walk toward a school with an AR-15, free from

the questions of law enforcement.  Certainly, the state of the law on stopping persons openly carrying

firearms is not such that a reasonable officer observing what Cpl. Donohoe observed would be

unmistakably instructed against stopping Mr. Walker.

      Dep. Pauley is even farther removed from a clear constitutional violation under the facts of

this case.  The worst that can be reasonably argued as to the state of the relevant law, as discussed

above, is that it arguably does not clearly validate Cpl. Donohoe's actions.  It certainly does not

clearly establish them as unlawful.  And it most certainly does not so clearly establish them as

unlawful that a junior officer like Dep. Pauley would be constitutionally remiss in failing to intervene

against his far more senior superior officer.

      Therefore, even if this Court finds a constitutional violation in the officers' conduct, it cannot

be said to have been a violation of a clearly established right that would be readily apparent to a reasonable officer.  The Defendants are entitled to qualified immunity from Plaintiff's claims, and therefore to summary judgment.

## IV. CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Defendants respectfully pray this Honorable Court GRANT their Motion for Summary Judgment, removing this case from its docket, and grant them such other relief as the Court deems just and proper.

**BRIAN E. DONOHOE and BRANDON W. PAULEY,**
**By Counsel,**

  /s/ Adam K. Strider
**Charles R. Bailey (WV Bar #0202)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**cbailey@baileywyant.com**
**astrider@baileywyant.com**

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

**MICHAEL WALKER, individually,**

    **Plaintiff,**

**v.**                                         **Civil Action No. 3:18-cv-01523
Honorable Robert C. Chambers**

**M.H. LOVEJOY, in his individual capacity;
B.E. DONAHOE, in his individual capacity;
B.W. PAULEY, in his individual capacity;
PUTMAN COUNTY COMMISSION, a
political subdivision of the State of West
Virginia,**

    **Defendants.**

<u>**CERTIFICATE OF SERVICE**</u>

    I HEREBY CERTIFY that a true and correct copy of foregoing **"MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT"** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this 13th day of December, 2019:

John H. Bryan, Esq.
Law Office of John H. Bryan
611 Main Street
PO Box 366
Union, WV  24983
Email Address: jhb@johnbryanlaw.com
*Counsel for Plaintiff Michael Walker*

                          **/s/ Adam K. Strider**
                          **Charles R. Bailey (WV Bar #0202)**
                          **Adam K. Strider (WV Bar #12483)**