IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

MICHAEL WALKER, individually,

       Plaintiff,

vs.                                   Civil Action No. : 3:18-cv-01523
                                       Hon. Robert C. Chambers, U.S. District Judge

M. H. LOVEJOY, in his individual capacity,
B.E. DONAHOE, in his individual capacity,
B.W. PAULEY, in his individual capacity,
PUTNAM COUNTY COMMISSION, a
political subdivision of the State of West
Virginia,

       Defendants.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

      I.      INTRODUCTION

    A.      Factual background

On February 21, 2018, Putnam County Sheriff's Office Deputy B.E. Donahoe responded to a complaint relayed from the emergency dispatch center that someone had reported that there was an individual walking down the side of a public road while in possession of a firearm. The individual was the plaintiff, Michael Walker, who being a victim of epileptic seizures, does not have a driver's license. He was headed coyote hunting, and had a rifle strapped over his back, along with a backpack. He was stopped and forced to hand over his ID to Defendant Donahoe, a deputy with the Putnam County Sheriff's Office, so that he could run a background check on him, in order to ascertain whether he was a prohibited person from possessing a firearm. In the

1

process of doing so, the plaintiff was told that he was required to comply, and that he could not leave.  Donahoe ran a background check on him, which came back clean, at which point plaintiff was then allowed to leave; but not before being verbally berated by Defendant Donahoe, all of which was caught on video.  The plaintiff was not charged with any wrongdoing arising from the incident, and subsequently filed suit under 42 U.S.C. 1983, in order to establish Defendant Donahoe's actions, which Donahoe claims to perform on anyone he observes with a firearm, was indeed a civil rights violation for which he is entitled damages.

1. **The Encounter in Defendant Donahoe's Own Words:**

At the time Deputy Donahoe responded to the scene, he possessed no prior knowledge of Mr. Walker.  All he knew about Mr. Walker is what he observed when he arrived at the scene, which was observing him walking down the side of the road (Donahoe Deposition at 6:2-5). Donahoe did not recall who had called 911, or specifically what the complainant had stated, other than the complaint that there was a guy walking down the side of the road with a firearm. (Donahoe 6:18-24; 7:1-6).  Upon arriving at the scene, Donahoe observed Mr. Walker walking down the side of the road with a rifle "strapped across his back," with the muzzle of the gun pointed towards the sky. (Donahoe 7:7-15; 9:1-5).[1]

Upon arriving at Mr. Walker's location, and observing him walking down the side of the road, Defendant Donahoe did not observe Mr. Walker committing any crime, but rather just walking. Nor was he informed by any other source that any crime had been committed (Donahoe 7:16-21; 8:10-14). Donahoe had no information or evidence that Mr. Walker was a person who was prohibited under state or federal law from possessing a firearm (Donahoe 7:23-24; 8:1-4).

---

[1] The end of the video shows that the muzzle was actually safely pointed at the ground.

However, despite any knowledge a crime had been committed, and despite the fact that West Virginia is an open-carry state, and thus it's legal to openly carry a firearm on one's person, Defendant Donahoe nevertheless wanted to obtain Mr. Walker's ID in order to run a background check on him, for the purpose of ascertaining whether he was a person prohibited from firearm possession under the law (Donahoe 8:5-9).

Donahoe testified that he did not observe Mr. Walker doing anything unsafe with the rifle strapped on his back; nor did he observe the rifle in Mr. Walker's hands; nor did he observe Mr. Walker acting threatening in any way (Donahoe 9:7-13). Donahoe's only reason for stopping Mr. Walker while he was walking down the side of the road was in order to find out if Mr. Walker was a prohibited person (Donahoe 9:15-24).

As portrayed by video footage taken by Mr. Walker, using his cell phone, Mr. Walker did not voluntarily consent to being stopped by Donahoe; nor to hand over his ID for purposes of the officer running a background check (Donahoe 10:16-24). However, Donahoe gave Mr. Walker "no choice" in the matter (Donahoe 10:16-24). Donahoe told Mr. Walker during the stop that he was not free to leave until he was done with his investigation (Donahoe 11:19-24; 12:1-8). Donahoe explained that the only investigation he was undertaking at the time, to which Mr. Walker was forced to submit, was to run Mr. Walker's criminal history report, in order to determine whether he "was a person that could possess a firearm." (Donahoe 11:5-8). However, admittedly, Defendant Donahoe had no information - neither prior to, nor during the stop - indicating that Mr. Walker may have been a prohibited person, which he wasn't (Donahoe 11:5-8).

After Mr. Walker reluctantly complied with the requirement that he turn over his ID for a background check, and after it was returned, Mr. Walker continued walking down the road, as he had been doing prior to being stopped. At that point, Defendant Donahoe left to go do something else, without even speaking to Deputy Pauley, who was present at the scene, watching the encounter (Donahoe (13:13-20).  Donahoe did not follow, nor investigate Mr. Walker further, in order to ascertain where he was headed (Donahoe 14:10-12). Other than the presence of a lawfully possessed firearm, Donahoe admitted under oath that had no indications that Mr. Walker was a threat to anyone, nor that he had any ill intentions (Donahoe 16:1-4).

    **2.**    **The Video:**

The Court doesn't only have to accept Defendant Donahoe's own testimony as the sole evidence against him.  There's a video of the encounter, which required Defendant Donahoe to testify consistent with what had actually happened, rather than his own characterization of the incident.  The video is troubling, not just because it shows a blatant disregard of the Fourth Amendment, as far as search and seizure goes, but it shows Defendant Donahoe's verbal abuse towards an innocent citizen attempting to exercise his open carry rights, and his Fourth Amendment rights under state and federal law.

At the beginning of the video, you see that the plaintiff is filming his own face, as he is walking, because he sees police officers approaching and he suspects that they are going to stop him for no reason.[2]  You first see blue lights begin to reflect on Mr. Walker's face as he's walking.  Then, Donahoe's voice can be heard asking a question, presumably something to the effect of, "Where are you headed?"  Mr. Walker responds, "Up to a buddy's."  Donahoe then

---

[2] *See* Video of incident, attached hereto as Exhibit "B," a hard copy of which is being mailed to the Clerk, since it likely will be too large to upload.

asks, "Got some ID on you?," to which the plaintiff responds, "Have I broken any laws?" Donahoe then says, "I'm asking you if you've got any ID on you?" Mr. Walker again asks if he has broken any laws. Donahoe then, raising his voice louder, says threateningly, "I'm asking you, one time, and one time only, if you have any ID on you." Mr. Walker says, "Yes." Donahoe says, "Can I have it please?"

    Mr. Walker then interjects, again, "Can you tell me what crime I've committed?" Donahoe responds:

> Because I'm asking you for ID. I have the right to ask anybody who they are, and if they have any ID. You do not have to break a law for me to ask you who you are….
>
> Do you want to listen to me, or not….

Donahoe then asks, "Where's your destination?" Walker responds, "You don't need to know that." Donahoe then said, "Well, you need to give me some ID." Mr. Walker then complied and gave Donahoe his ID. At that point, Mr. Walker turned the camera from himself and showed Donahoe, and asked his name, to which he said his name. As Mr. Walker was getting out his ID, he also panned the camera towards the other officer present, who was observing, but not talking, and asked his name. The other officer responded "Pauley."

    As the ID was handed to Donahoe, who's hand was outstretched waiting for it, he looked at it, and said "Thank you….. Mr. Walker." Donahoe can then be heard contacting dispatch, and relays Mr. Walker's ID number to the dispatcher, in order to obtain a criminal background check. As he's waiting for the results, Mr. Walker asks, "Now why did you all stop me?" Donahoe responds, "People are calling saying that you're walking down the road with a gun . . . . everybody in the world is gonna call, you know as well as I do." Mr. Walker then says, "I have

been walking up and down this road for years, carrying a firearm; I have done nothing wrong; I am just simply walking up the road." Donahoe then says, with Pauley watching on, "I understand that . . . . I understand its everybody's right to carry a gun, I understand that okay." Mr. Walker then says, "Then why am I getting stopped?" Donahoe then says, "Again, I can stop and talk to anybody that I want to, right?" To which Mr. Walker says, "Unless I have committed a crime . . . ." Donahoe interrupts him to say, "I'm not patting you down."

Mr. Walker then asked, "Are you detaining me?" At first, Defendant Donahoe said, "That's up to you," to which Mr. Walker replied, "If it's up to me, I'm gonna be on my way." Donahoe then said, "Ok, at this point, you can be on your way, when I tell you you can walk off." Mr. Walker replied, "Okay, so I'm being detained?" Donahoe then said, "At this point, **I have the absolute right to see whether you're legal to carry that gun or not**." Mr. Walker then asks, "Am I suspected of not being legal to carry a firearm?" Donahoe then said, "Listen to me; have you ever committed any crime that would keep you from carrying a firearm?" Walker said, "No . . . . do you have suspicion that I have committed a crime that would keep me from carrying a firearm?" Donahoe then said, "Everybody in the world; I have no idea; everybody I come across." At that point Donahoe then starts talking into his radio to the dispatcher, and specifically asks her for Mr. Walker's criminal history. As that's happening, he says to the plaintiff,

> Everybody in the world that I deal with, that has a gun, I check and see whether they have committed a crime that would keep them to carry possess a gun. It will only take a minute. If you have not, you're kicked on down the road. You can go and carry or whatever you want to do. Okay, as for taking that in any store, if you plan on going in any store, I would highly advise against it.

6

Mr. Walker then informed Deputy Donahoe that he's done it several times, because walking is his only transportation, and that he's walked into many stores with the same firearm he was carrying.  To this, Donahoe began to raise his voice again, and stated, "Why do you need to carry an AR-15 with you?" At that point Mr. Walker said that he didn't want to answer questions.

When Mr. Walker said he wasn't going to answer any more questions, Deputy Donahoe was silent for a few moments, and then said, "Jesus Christ . . . what do you got, a Colt."  Mr. Walker repeated that he wasn't answering questions. Donahoe then approached Mr. Walker as if to place his hands on him, or his rifle, still strapped on his back. Mr. Walker said, "Don't touch me or my property."  Donahoe took a step backwards, and said, "I'm looking, I'm just seeing what kind of gun you got brother," to which Mr. Walker once again repeated himself.  At that, Donahoe, now visible in the video, said:

> You know what?  I understand the whole sovereign citizen bullshit, okay? And I've had it up to here with this (mimicking Mr. Walker) "I don't have to answer any fucking questions," or what not. You make it more fucking difficult for anybody to do their damn job out here. I'm just wondering what you have; I'm not gonna take it from you at this point.

Mr. Walker then states, "It doesn't matter what I have; I'm not breaking any laws; I'm not committing any crime."  Donahoe continued:

> Listen to me!  I like guns too. I'm just kind of curious what you like to carry.  I'm making small talk. Okay? **You can do this bullshit all you want, and I can't fucking stand cocksuckers that do this kind of shit that make it more difficult.** "I don't have to answer questions" (mimicking Mr. Walker). You known what? That's all I hear all God damned day.

"That's not my fault, sir," Mr. Walker replied.  Donahoe immediately said:

> **It is your fault! Because you cocksuckers . . . start it.  I ask you for ID - when a law enforcement officer asks you for ID, it's not "I don't have to provide it," it's "here it is, sir," because, by law, you fucking got to give it, when you are asked for it.**  And if

7

> you think you don't, [then] press the issue, we'll find out; I'll hook you, book you, jamb you in the jail; and then you can't answer to a God damned judge.

Then Mr. Walker tells Donahoe, "I've already been through this situation once. He says, "I don't care, you can go through it again." Walker was referring to his prior arrest by Defendant Lovejoy, the prior December, which resulted in him spending time in jail, the result of which was Walker being found not guilty of the charges.

At that point, the dispatcher's voice came back over the radio, and explains Mr. Walker's criminal history to Donahoe, which included the prior arrest by Lovejoy, for which he was acquitted, as well as an old misdemeanor possession of marijuana conviction (four years prior), which did not affect his right to possess a firearm. Donahoe then again began to argue with Mr. Walker about what he claimed was his right to run a background check on anyone carrying a gun:

> I don't know whether you can, or can't, but it is my right to figure out whether you can, or can't have one . . . .
>
> I can check anybody in the world. If I see you have a gun, I can run your name, check you, and see whether you can possess it or not, and don't tell me that I can't either, because I do it every day, and I arrest people every day for it.

Mr. Walker then repeated, once again, and correctly, "Unless I have committed a crime, or broken the law, or I am suspect of breaking the law, or committing a crime, you are not allowed to stop me." Donahoe then gave him his ID back and said, "You're wrong. Take off." Plaintiff then walked on down the street, as he was attempting to do in the first place. The last bits of the video show Mr. Walker, again looking in the camera, and complaining that there was no reason for them to stop him. He panned the camera to show his rifle, and specifically how it was safely and securely being carried over his back.

8

II. ANALYSIS

A. COUNT THREE - SEARCH AND SEIZURE VIOLATION - 2/21/18

### 1. Stopping the Plaintiff for open carrying a firearm without reasonable suspicion is an unreasonable search and seizure

Amendment IV of the U.S. Constitution provides that "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. Article III, Section 6 of the West Virginia Constitution provides for the same protections, almost verbatim. A warrantless search is " *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).

As this Court noted in its September 27, 2019 Memorandum Opinion and Order resolving the pending Rule 12(b)(6) motions, a police officer cannot stop anyone he encounters who has a gun, in order to perform a background check, unless he has reasonable suspicion for doing so (*Citing* United States v. Black, 707 F.3d 531, 539–40 (holding that an officer can stop a person carrying a firearm in an open-carry state when the officer has reasonable suspicion)). Indeed, "Once an officer has reasonable suspicion to stop a suspect, the officer may conduct a limited search for weapons if the officer reasonably believes the defendant may be armed and dangerous." United States v. Robinson, 846 F.3d 694, 698 (4th Cir. 2017) (*citing* Arizona v. Johnson, 555 U.S. 323, 326–27 (2009)). In the case *sub judice*, there is no genuine factual

9

dispute over the legality of the stop since, by Defendant Donahoe's own admission, there was no reasonable suspicion present, but rather a stop merely to run a background check.

The "touchstone" of any Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (*citing* Terry v. Ohio, 392 U.S. 1, 19 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (*citing* Terry, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." United States v. Cortez, 449 U.S. 411, 417–18 (1981); United States v. Black, 707 F.3d 531, 539–40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. Cortez, 449 U.S. at 417–18 (*cited* by 9/17/19 Memorandum Op. at 4-5).

Here, there can be no dispute that Defendant Donahoe stopped the Plaintiff, and that he did so against his will, and that he was not free to leave. There can be no dispute that he did so for the sole purpose of obtaining Mr. Walker's ID, and running a criminal background check on the plaintiff - exactly the behavior which was illustrated as being prohibited under the Fourth Amendment by the Court in the Black case, which has been controlling and important precedent in the Fourth Circuit since 2013. *See* United States v. Black, 707 F.3d 531, 539–40 (4th Cir. 2013). As is illustrated by the video, and admitted by Donahoe during his deposition, the plaintiff clearly did not want to be stopped; he did not want to hand over his ID; he did not want to

answer questions. He repeatedly asked Donahoe if he had committed a crime, or if he was suspected of committing a crime. The plaintiff had more knowledge of the law than did Deputy Donahoe, and he accurately informed Deputy Donahoe, repeatedly, of the fact that he was not supposed to be stopping him without reasonable suspicion that he had committed a crime. Likewise, Defendant Pauley should be held liable under Count Four - for bystander liability, because he stood by and did nothing, while Donahoe performed an illegal search and seizure. There's no excuse for police officers being completely unaware of the requirement of reasonable suspicion.

      1.      **Defendants are not entitled to Qualified Immunity.**

The only thing at issue, given the admission by Donahoe that he had no reasonable suspicion to stop Mr. Walker, is whether he nonetheless should be granted immunity from civil liability under the doctrine of Qualified Immunity, and whether Pauley, as the bystanding officer, should be likewise held liable. Qualified Immunity has its place, but it wouldn't be proper to give it to a police officer who admittedly stops a citizen for no legal reason in order to subject him to a background check, and then repeatedly calls him a "cocksucker" and a "sovereign citizen," which he is not, merely for accurately asserting his rights. This Court applied qualified immunity to Defendant Lovejoy in regards to Count One of the Complaint for the very reason that once reasonable suspicion existed, Lovejoy was arguably entitled to perform a Terry Frisk, and disarm the plaintiff (*See* Mem. Op. and Order at 10). On the other hand, if there was no reasonable suspicion present for Donahoe's stop, which there wasn't by Donahoe's own sworn testimony, then he cannot be entitled to qualified immunity. He should have known what every officer is expected to know, which is that you can't stop a citizen, demand his ID, and run a

background check, without first acquiring reasonable suspicion. However, there's an even more important reason why Donahoe should be held liable, and it's even written into the very case law which governing Donahoe's conduct.

The Fourth Circuit has specifically discussed, and denounced, this very problem. The Court has already illustrated the importance of establishing liability against officers who abuse Terry stops for this purpose.

Writing for the Court in the Black case, Judge Gregory wrote that:

At least four times in 2011, we admonished against the Government's misuse of innocent facts as indicia of suspicious activity. *See* United States v. Powell, 666 F.3d 180 (4th Cir. 2011); Massenburg, 654 F.3d 480; United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011); and United States v. Foster, 634 F.3d 243 (4th Cir.2011). Although factors "susceptible of innocent explanation," when taken together, may "form a particularized and objective basis" for reasonable suspicion for a Terry stop, United States v. Arvizu, 534 U.S. 266, 277–78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), this is not such a case. Instead, we encounter yet another situation where the Government attempts to meet its Terry burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion.
…

Second, Gates' prior arrest history cannot be a logical basis for a reasonable, particularized suspicion as to Black. Without more, Gates' prior arrest history in itself is insufficient to support reasonable suspicion as to Gates, much less Black. *See* Powell, 666 F.3d at 188 ("[A] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." (citation omitted)). Moreover, we "ha[ve] repeatedly emphasized that to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." DesRoches v. Caprio, 156 F.3d 571, 574 (4th Cir.1998) (quotation marks and alterations omitted) (emphasis added). In other words, the suspicious facts must be specific and particular to the individual seized. Exceptions to the individualized suspicion requirement "have been upheld only in 'certain limited circumstances,' where the search is justified by 'special needs' "—that is, concerns other than crime detection—and must be justified by balancing the individual's privacy expectations against the government interests. Id. (*quoting* Chandler v. Miller, 520 U.S. 305, 308, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)); *see* Treasury Employees v. Von Raab, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Here, the Government has not identified any substantial interests that override Black's interest in privacy or that suppress the normal requirement of individualized suspicion.

> Third, it is undisputed that under the laws of North Carolina, which permit its residents to openly carry firearms, see generally N.C. Gen.Stat. §§ 14–415.10 to 14– 415.23, Troupe's gun was legally possessed and displayed. The Government contends that because other laws prevent convicted felons from possessing guns, the officers could not know whether Troupe was lawfully in possession of the gun until they performed a records check. Additionally, the Government avers it would be "foolhardy" for the officers to "go about their business while allowing a stranger in their midst to possess a firearm." We are not persuaded.
>
> Being a felon in possession of a firearm is not the default status. More importantly, ***where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states***. United States v. King, 990 F.2d 1552, 1559 (10th Cir.1993) (emphasis added). Here, Troupe's lawful display of his lawfully possessed firearm cannot be the justification for Troupe's detention. See St. John v. McColley, 653 F.Supp.2d 1155, 1161 (D.N.M. 2009) (finding no reasonable suspicion where the plaintiff arrived at a movie theater openly carrying a holstered handgun, an act which is legal in the State of New Mexico.) That the officer had never seen anyone in this particular division openly carry a weapon also fails to justify reasonable suspicion. From our understanding of the laws of North Carolina, its laws apply uniformly and without exception in every single division, and every part of the state. Thus, the officer's observation is irrational and fails to give rise to reasonable suspicion. To hold otherwise would be to give the judicial imprimatur to the dichotomy in the intrusion of constitutional protections.

United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013).

Judge Gregory was speaking to exactly the circumstances which occurred to the plaintiff. Deputy Donahoe targeted him merely because he was exercising his open carry rights under state law, which were important to Mr. Walker, given the fact that he is a seizure victim and cannot have a driver's license. He therefore is required to walk, and if he is going coyote hunting, he has to bring his equipment with him. The malicious nature of Donahoe's treatment of the plaintiff is reason alone to find that he acted in bad faith, and therefore should not be entitled to qualified immunity. Had Judge Gregory observed the video of Defendant Donahoe, the Black opinion would likely have contained much stronger language, assuming that is possible.

13

Plaintiff respectfully requests that summary judgment be entered against the defendants, and that a jury trial be held on the issue of damages. A jury should see the video, and have the option to award damages against Donahoe. Moreover, the statements made by Donahoe that he engages in the same illegal behavior with every gun owner he observes, illustrates the tyrannical and colossal ignorance of this police officer, and his complete indifference to the rights of law abiding citizens. The jury should also have the ability to assess damages against Defendant Pauley, who, like any other police officer, should have known better than to allow Donahoe's conduct. Instead, he stood by like a disinterested bystander.

## CONCLUSION

Defendant Donahoe engaged in an unreasonable search and seizure of Michael Walker, and pursuant to his own admissions, has done it many other times to other law abiding gun owners; and apparently will continue doing so. It's thus important to allow Mr. Walker's civil claim against him to proceed for a determination of damages by a federal jury. The Fourth Circuit has made it crystal clear that Donahoe's conduct, even without the bad language and insults, is reprehensible. Lastly, Defendant Pauley should not have stood there and watched Donahoe's behavior without stopping him, or assisting the victim citizen.

Accordingly, the plaintiff respectfully requests the Court to GRANT his motion and ORDER that summary judgment be entered in his favor on Count Two of the complaint.

                                                MICHAEL WALKER
                                                By Counsel

/s/ John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
611 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

for the Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

MICHAEL WALKER, individually,

    Plaintiff,

vs.                                    Civil Action No. : 3:18-cv-01523
                                    Hon. Robert C. Chambers, U.S. District Judge

M. H. LOVEJOY, in his individual capacity,
B.E. DONAHOE, in his individual capacity,
B.W. PAULEY, in his individual capacity,
PUTNAM COUNTY COMMISSION, a
political subdivision of the State of West
Virginia,

    Defendants.

## CERTIFICATE OF SERVICE

    I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT upon counsel of record by using the CM/ECF System, this the 13th day of December, 2019, and addressed as follows:

John P. Fuller, Esq.
Charles R. Bailey, Esq.
Adam K. Strider, Esq.
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, WV 25337-3710

                                                      /s John H. Bryan