## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

**MICHAEL WALKER, individually,**

        **Plaintiff,**

**vs.**                          **Civil Action No. : 3:18-cv-01523**
                                    **Hon. Robert C. Chambers, U.S. District Judge**

**M. H. LOVEJOY, in his individual capacity,**
**B.E. DONAHOE, in his individual capacity,**
**B.W. PAULEY, in his individual capacity,**
**PUTNAM COUNTY COMMISSION, a**
**political subdivision of the State of West**
**Virginia,**

        **Defendants.**

## PROPOSED INTEGRATED PRETRIAL ORDER

    **NOW COME** the Plaintiff, Michael Walker, by counsel, John H. Bryan, and the law firm

of John H. Bryan, Attorneys at Law, and the Defendants, B.E. Donahoe and B.W. Pauley, by

counsel, Charles R. Bailey, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and in

accordance with the Scheduling Order entered by this Court, hereby presents their portion of the

Proposed Integrated Pretrial Order.

**I.**    **Pre-Trial Disclosures Required by Fed. R. Civ. P. 26(a)(3).**

    **PLAINTIFF:**

    **A.**    **Plaintiff's Witnesses**

        1.    Plaintiff, Michael Walker

        2.    Defendant Brian Donahoe, deputy, Putnam County Sheriff's Dept.

        3.    Defendant Brandon Pauley, deputy, Putnam County Sheriff's Dept.

        4.    Defendant Eric Hayzlett, chief deputy, Putnam County Sheriff's Dept.

**B.**     **Plaintiff's Expert Witnesses**

    1.     None.

**C.**     **Plaintiff's Witnesses by Deposition**

    1.     None.

**D.**     **Plaintiff's Identification of Documents/Exhibits**

1.     Video taken by Michael Walker's cell phone during the encounter at issue.

2.     February 23, 2018 "Officer Safety BOLO"

3.     West Virginia Intelligence Exchange Report, February 23, 2018

4.     Deposition transcript of Defendant Donahoe, if necessary

5.     Deposition transcript of Defendant Pauley, if necessary

**<u>DEFENDANTS</u>:**

**A.**     **Defendants' Expect to Call the Following Fact Witnesses at the Trial of this Matter:**

    1.     Plaintiff, Michael Walker

    2.     Defendant, Corporal Brian E. Donohoe, Putnam County Sheriff's Dept.

    3.     Defendant, Deputy Brandon W. Pauley, Putnam County Sheriff's Dept.

**B.**     **Defendants May Call the Following Witnesses if the Need Arises:**

    1.     Chief Deputy Eric Hayzlett, Putnam County Sheriff's Dept.

    2.     Deputy Steven Martin, Putnam County Sheriff's Dept.

**C.**     **Defendants Expect to Call the Following Expert Witnesses at the Trial of this Matter:**

    1.  None

    **D.**    **Defendants' Designation of Those Witnesses Whose Testimony these Defendants Intend to Present by Deposition:**

        1.    None

    **E.**    **Defendants' Exhibits which Defendants Expect to Offer at Trial:**

        1.    Visual Rendering of an AR-15 style rifle

        2.    An NBC News article reporting the Parkland, Florida school shooting of February 14, 2018 (https://www.nbcnews.com/news/us-news/police-respond-shooting-parkland-florida-high-school-n848101).

**II.**    <u>**Contested Issues of Law Requiring a Ruling before Trial.**</u>

    1.    Cross Motions for Summary Judgment

    2.    Defendant's Motion *in limine* to Exclude Portions of the Video Recording of the Stop of the Plaintiff.

**III.**    <u>**Plaintiff's Brief Statement of Essential Elements Which Must be Proven, and the Damages or Relief Sought.**</u>

    1.    <u>Search and Seizure Under 42 U.S.C. 1983</u>

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983.  To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed right by the Defendant under color of law. ( 1. that the defendant was acting under color of state law, 2. that the defendant engaged in actions that deprived the plaintiff of his constitutional right not to be subject to an unreasonable search and seizure, and 3. that the defendant's acts were the proximate cause of the injuries claimed by the plaintiff)  Plaintiff asserts that the defendant police officers violated his Fourth Amendment rights to be free from unreasonable search and seizure when he was subjected to an investigatory stop without reasonable suspicion, as alleged in the complaint.

It cannot be disputed that, in an open carry state, such as North Carolina, or West Virginia, a police officer cannot stop anyone he encounters who has a gun, in order to perform a background check, unless he has reasonable suspicion for doing so (*Citing* United States v. Black, 707 F.3d 531, 539–40 (holding that an officer can stop a person carrying a firearm in an open-carry state if the officer has reasonable suspicion)). By Defendant Donahoe's own admission, there was no reasonable suspicion present justifying the investigatory detention of the plaintiff.  He admitted that he had no prior knowledge of him, nor any reason to believe that he had committed any crime. He merely wanted to obtain the plaintiff's ID in order to run his criminal history, to see if he was a prohibited person.  And that is exactly what the Fourth Circuit holding in U.S. v. Black says that a police officer cannot do.

After-the-fact, the defendants claim concern over the Parkland school shooting, and the fact that the plaintiff possessed an AR-15.  Even assuming that the make or type of lawful weapon was legally relevant, which it's not, the video of the encounter showed no concern over any nearby schools. Donahoe stated repeatedly in the video that he only wanted to check his criminal history to see if he's a prohibited person. He said nothing about a school. Donahoe admitted during his deposition that he didn't even bother to follow, or watch, the plaintiff after releasing him, to see if he was heading towards a school.  He went off and did something else.  He also admitted that he never mentioned anything to Defendant Pauley, who was there with him, about any concern about a potential school shooting concern.  Had he been the least bit concerned about a school shooting, he could have observed the plaintiff to see where he was going - or asked Pauley to do so. The school shooting defense was an after-thought, and an offensive one at that.

Either Donahoe had reasonable suspicion to perform a stop, or investigative detention; or he didn't. And if he didn't, it was an unreasonable search and seizure. The "touchstone" of any

Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (*citing* Terry v. Ohio, 392 U.S. 1, 19 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (*citing* Terry, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." United States v. Cortez, 449 U.S. 411, 417–18 (1981); United States v. Black, 707 F.3d 531, 539–40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. Cortez, 449 U.S. at 417–18 (*cited* by 9/17/19 Memorandum Op. at 4-5).

It was clear from the video that the plaintiff was not free to leave during the encounter. Donahoe admitted in his deposition that the plaintiff was not free to leave. If there was "no reasonable, articulable suspicion that criminal activity is afoot," and a "particularized and objective basis for suspecting the particular person" of engaging in that activity, then there can be no legal seizure under the Fourth Amendment. Reasonable suspicion is the foundation of all police work, and is a standard that is taught to police officers from day one.  As such, Defendant Pauley, who can be observed in the video, should have stopped Donahoe. But he did not, and is therefore liable under the doctrine of bystander liability.

Neither defendant should be entitled to qualified immunity. Qualified Immunity has its place, but it wouldn't be proper to give it to a police officer who admittedly stops a citizen for no legal reason in order to subject him to a background check, and then repeatedly calls him a "cocksucker" and a "sovereign citizen," merely for accurately asserting his rights under the

Constitution. Nor should it be given to a police officer who stands by and observes such a violation, without taking action to protect the citizen. The defendants disagree with the holding in United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013) and are asking this Court to carve an exception around it, which would render it meaningless, which is exactly what Judge Gregory was describing in that opinion when he said that "[p]ermitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." Id.

**IV.    Defendants' Brief Statement of Essential Elements Which Must be Proven to Establish any Meritorious Defenses.**

**A.    Objection to the Plaintiff's arguments in the foregoing section.**

The foregoing section is not, as is contemplated by this Pretrial Order, a staid exposition of the elements which the Plaintiff must prove in order to prevail in this matter. Rather, the Plaintiff has used that page space as a back door to respond to the Defendants' Motion for Summary Judgment, and reply to the Defendants' Response to Plaintiff's Motion for Summary Judgment, outside the respective appropriate time frames. The deadline for a Response was December 27, 2019. The deadline for a Reply was January 3, 2020. The Plaintiff did not timely file either. Accordingly, the Defendants urge the Court not to consider those arguments in its consideration of those Motions.

**B.    Reasonable suspicion existed for an investigatory stop of the Plaintiff.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. This Court expounded on the legal framework governing the relevant Fourth Amendment analyses in a prior Order in this matter, as follows:

The "touchstone" of any Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *United States v. Black*, 707 F.3d 531, 539-40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. *Cortez*, 449 U.S. at 417-18.

*Walker v. Lovejoy*, CIVIL ACTION NO. 3:18-1523, 2019 U.S. Dist. LEXIS 166458, 2019 WL 4741709, *6-*7 (S.D.W.Va., Sept. 27, 2019).

The question here is not whether the open carrying of firearms, in and of itself, gives rise to a suspicion of criminal activity, but whether, taken as a whole, the totality of the circumstances give rise to a reasonable suspicion sufficient to justify a stop and short identification inspection. This question has been posed by the United States Supreme Court as follows:

The reasonable-suspicion standard is a derivation of the probable-cause command, applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, ***to prevent imminent crimes***, and to protect law enforcement officers in highly charged situations.

*United States v. Sokolow*, 490 U.S. 1, 12, 109 S.Ct. 1581, 104 L. Ed. 2d 1 (1989) (Emphasis added). The reasonable suspicion standard necessary to justify a minimal intrusion such as a brief investigatory stop is an objective one which does not depend on the officers' subjective belief.

Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the officer] to determine whether he thought the facts constituted reasonable suspicion. Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, courts are not remiss in crediting the practical experience of officers

who observe on a daily basis what transpires on the street.

*United States v. Foreman*, 369 F.3d 776, 781-782 (4th Cir. 2004).

The officers observed Mr. Walker, a man in his early twenties, walking distance from a school then in session, walking toward that school, carrying an AR-15 style rifle, seven (7) days after a nationally-covered school shooting involving the same style of weapon. These objective facts, knowable and known to the officers at the time of the stop, are plainly sufficient to justify a brief, investigatory stop.

     **C.    In stopping the Plaintiff, the officers were undertaking a valid community caretaking function.**

The community caretaker function is a recognized exception to the Fourth Amendment. *U.S. v. Pollard*, 595 Fed. Appx. 204, 206 (4th Cir.2014) (holding that officers approaching a stopped vehicle does not implicate Fourth Amendment because officers acting in a community caretaking capacity); *U.S. v. Brown*, 447 Fed. Appx. 706, 710 (6th Cir.2012); ("No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions."); *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408 (1978) ("the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943 (2006) ("One exigency obviating the requirement of a warrant is the need to assist the persons who are seriously injured or threatened with such injury."); *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir.2008); *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir.2006).

The community caretaking function of the police may come into play when there is a risk of danger to the police or others, and may, therefore, be properly classified as an example of exigent circumstances. See *Ziegler* at 785. Community caretaking functions include stopping or

seizing a citizen for his own safety and/or the safety of others, regardless of the officers' suspicion of criminal activity or lack thereof. See *U.S. v. King*, 990 F.3d 1552, 1560 (10th Cir. 1993) ("In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person ... in order to ensure the safety of the public and/or the individual, ***regardless of any suspected criminal activity.***) (Emphasis added).  Thus, this exception allows an officer "to detain individuals to prevent them from harming themselves or others." *Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir.2006) (citing *King* at 1560); see also *U.S. v. Rodriguez-Morales*, 929 F.2d 780, 784-785 (1st Cir. 1991) ("In performing this community caretaking role, police are expected to aid those in distress, combat actual hazards, ***prevent potential hazards from materializing*** and provide an infinite variety of services to preserve and protect public safety.") (Emphasis added); *U.S. v. Nord*, 586 F.2d 1288, 1290 (8th Cir.1978) (routine community caretaking functions of police include "responding to calls to assist persons in need of immediate aid").

> **D.**     **The Defendants are entitled to qualified immunity.**

Governmental officials performing discretionary functions are shielded from liability for money damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Moreover, "there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. ***Second, the manner in which this right applies to the actions of the official must also be apparent.***" *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Tarantino v. Baker*, 825 F.2d 772, 774-75 (4th Cir. 1987), *cert. denied*, 489 U.S. 1010, 103 L. Ed. 2d 180, 109 S. Ct. 1117 (1989)) (Emphasis added). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40, 97

L. Ed. 2d 523, 107 S. Ct. 3034 (1987); *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc).

It is not sufficient that a right be clearly established in an abstract sense; it must be clearly established in its particularized application.

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless that very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Maciariello* at 298 (quoting *Anderson* at 639-640). Applicable to the instant matter, this means that it would be improper to state that a clearly established right of Mr. Walker's was violated merely because the 4th Amendment and the legality of openly carrying firearms are clearly established. Such an interpretation of qualified immunity "would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

V. **Brief Statement of Material Facts and Theories of Liability.**

**PLAINTIFF:**

A. **Plaintiff's Brief Statement of Material Facts**

At the time Deputy Donahoe responded to the scene, he possessed no prior knowledge of Mr. Walker. All he knew about Mr. Walker is what he observed when he arrived at the scene, which was observing him walking down the side of the road (Donahoe Deposition at 6:2-5). Donahoe did not recall who had called 911, or specifically what the complainant had stated, other than the complaint that there was a guy walking down the side of the road with a firearm. (Donahoe

6:18-24; 7:1-6).  Upon arriving at the scene, Donahoe observed Mr. Walker walking down the side of the road with a rifle "strapped across his back," with the muzzle of the gun pointed towards the sky. (Donahoe 7:7-15; 9:1-5).[1]

Upon arriving at Mr. Walker's location, and observing him walking down the side of the road, Defendant Donahoe did not observe Mr. Walker committing any crime, but rather just walking. Nor was he informed by any other source that any crime had been committed (Donahoe 7:16-21; 8:10-14). Donahoe had no information or evidence that Mr. Walker was a person who was prohibited under state or federal law from possessing a firearm (Donahoe 7:23-24; 8:1-4). However, despite any knowledge a crime had been committed, and despite the fact that West Virginia is an open-carry state, and thus it's legal to openly carry a firearm on one's person, Defendant Donahoe nevertheless wanted to obtain Mr. Walker's ID in order to run a background check on him, for the purpose of ascertaining whether he was a person prohibited from firearm possession under the law (Donahoe 8:5-9).

Donahoe testified that he did not observe Mr. Walker doing anything unsafe with the rifle strapped on his back; nor did he observe the rifle in Mr. Walker's hands; nor did he observe Mr. Walker acting threatening in any way (Donahoe 9:7-13).  Donahoe's only reason for stopping Mr. Walker while he was walking down the side of the road was in order to find out if Mr. Walker was a prohibited person (Donahoe 9:15-24).

As portrayed by video footage taken by Mr. Walker, using his cell phone, Mr. Walker did not voluntarily consent to being stopped by Donahoe; nor to hand over his ID for purposes of the officer running a background check (Donahoe 10:16-24). However, Donahoe gave Mr. Walker "no choice" in the matter (Donahoe 10:16-24). Donahoe told Mr. Walker during the stop that he

---

[1] The end of the video shows that the muzzle was actually safely pointed at the ground.

was not free to leave until he was done with his investigation (Donahoe 11:19-24; 12:1-8).

Donahoe explained that the only investigation he was undertaking at the time, to which Mr. Walker

was forced to submit, was to run Mr. Walker's criminal history report, in order to determine

whether he "was a person that could possess a firearm." (Donahoe 11:5-8). However, admittedly,

Defendant Donahoe had no information - neither prior to, nor during the stop - indicating that Mr.

Walker may have been a prohibited person, which he wasn't (Donahoe 11:5-8).

After Mr. Walker reluctantly complied with the requirement that he turn over his ID for a

background check, and after it was returned, Mr. Walker continued walking down the road, as he

had been doing prior to being stopped. At that point, Defendant Donahoe left to go do something

else, without even speaking to Deputy Pauley, who was present at the scene, watching the

encounter (Donahoe (13:13-20).  Donahoe did not follow, nor investigate Mr. Walker further, in

order to ascertain where he was headed (Donahoe 14:10-12). Other than the presence of a lawfully

possessed firearm, Donahoe admitted under oath that had no indications that Mr. Walker was a

threat to anyone, nor that he had any ill intentions (Donahoe 16:1-4). The hindsight defense of

concern over a school shooting should be disregarded by the Court.

It's been long held by the U.S. Supreme Court, that video footage which contradicts a

police officer's self-serving testimony, should be stricken by the Court. As the Fourth Circuit

explained in the 2013 case of Sawyer v. Asbury, arising out of this district, and argued by plaintiff's

counsel, the Fourth Circuit discussed the importance of video footage, even to the point of

throwing out a jury verdict:

> In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court held that, when
> "opposing parties tell two different stories, one of which is blatantly contradicted"
> by video evidence contained in the record, "so that no reasonable jury could believe
> it, a court should not adopt that version of the facts . . . ." Id. at 380. Rather than
> relying on "visible fiction" propounded by the party whose account is contradicted

by the video evidence, a court should "view[ ] the facts in the light depicted by the videotape." Id. at 381.

As we explained in Witt v. West Virginia State Police, Troop 2, 633 F.3d 272 (4th Cir. 2011), the principle articulated in Scott does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers some support for [the other side's] version of events." Witt, 633 F.3d at 276 (*emphasis in original*). Rather, the video controls only where it "'blatantly contradict[s]'" one side's testimonial account. Id. (*quoting* Scott, 550 U.S. at 380). Nevertheless, "[i]ncontrovertible evi- dence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court" when resolving a motion for judgment as a matter of law, "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) (applying Scott in context of motion for judgment as a matter of law).

Sawyer v. Asbury, 537 Fed. Appx. 283 (4th Cir. 2013).

The video shows clearly, and without any doubt, what Defendant Donahoe was doing, and why he was doing it.  It was all about getting the plaintiff's ID and running his criminal history, and had nothing to do with concern over anyone's safety, much less a school.  Donahoe's own words in the video provide the proof:

> You know what?  I understand the whole sovereign citizen bullshit, okay? And I've had it up to here with this (mimicking Mr. Walker) "I don't have to answer any fucking questions," or what not. You make it more fucking difficult for anybody to do their damn job out here. I'm just wondering what you have; I'm not gonna take it from you at this point.

Mr. Walker then states, "It doesn't matter what I have; I'm not breaking any laws; I'm not committing any crime."  Donahoe continued:

> Listen to me!  I like guns too. I'm just kind of curious what you like to carry.  I'm making small talk. Okay? **You can do this bullshit all you want, and I can't fucking stand cocksuckers that do this kind of shit that make it more difficult.** "I don't have to answer questions" (mimicking Mr. Walker). You known what? That's all I hear all God damned day.

"That's not my fault, sir," Mr. Walker replied.  Donahoe immediately said:

**It is your fault! Because you cocksuckers . . . start it.  I ask you for ID – when a law enforcement officer asks you for ID, it's not "I don't have to provide it," it's "here it is, sir," because, by law, you fucking got to give it, when you are asked for it.**  And if you think you don't, [then] press the issue, we'll find out; I'll hook you, book you, jamb you in the jail; and then you can't answer to a God damned judge.

In his deposition, Defendant Donahoe admitted that the "video showed what it showed." He had no concerns for its authenticity, or otherwise.

### B.    Plaintiff's Theories of Liability

It cannot be disputed that, in an open carry state, such as North Carolina, or West Virginia, a police officer cannot stop anyone he encounters who has a gun, in order to perform a background check, unless he has reasonable suspicion for doing so (*Citing* United States v. Black, 707 F.3d 531, 539–40 (holding that an officer can stop a person carrying a firearm in an open-carry state if the officer has reasonable suspicion)). By Defendant Donahoe's own admission, there was no reasonable suspicion present justifying the investigatory detention of the plaintiff.  He admitted that he had no prior knowledge of him, nor any reason to believe that he had committed any crime. He merely wanted to obtain the plaintiff's ID in order to run his criminal history, to see if he was a prohibited person.  And that is exactly what the Fourth Circuit holding in U.S. v. Black says that a police officer cannot do.

After-the-fact, the defendants claim concern over the Parkland school shooting, and the fact that the plaintiff possessed an AR-15.  Even assuming that the make or type of lawful weapon was legally relevant, which it's not, the video of the encounter showed no concern over any nearby schools. Donahoe stated repeatedly in the video that he only wanted to check his criminal history to see if he's a prohibited person. He said nothing about a school. Donahoe admitted during his deposition that he didn't even bother to follow, or watch, the plaintiff after releasing him, to see if he was heading towards a school.  He went off and did something else.  He also admitted that he

never mentioned anything to Defendant Pauley, who was there with him, about any concern about a potential school shooting concern.  Had he been the least bit concerned about a school shooting, he could have observed the plaintiff to see where he was going - or asked Pauley to do so. The school shooting defense was an after-thought, and an offensive one at that.

Either Donahoe had reasonable suspicion to perform a stop, or investigative detention; or he didn't. And if he didn't, it was an unreasonable search and seizure. The "touchstone" of any Fourth Amendment analysis is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (citing Terry v. Ohio, 392 U.S. 1, 19 (1968)). To be reasonable, a warrantless investigatory stop generally requires "a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30). Reasonable suspicion requires officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," for "[t]here is no reasonable suspicion merely by association." United States v. Cortez, 449 U.S. 411, 417–18 (1981); United States v. Black, 707 F.3d 531, 539–40 (4th Cir. 2013). Reasonable suspicion considers the "totality of the circumstances," which includes the "various objective observations" from which an officer can make deductions. Cortez, 449 U.S. at 417–18 (cited by 9/17/19 Memorandum Op. at 4-5).

It was clear from the video that the plaintiff was not free to leave during the encounter. Donahoe admitted in his deposition that the plaintiff was not free to leave. If there was "no reasonable, articulable suspicion that criminal activity is afoot," and a "particularized and objective basis for suspecting the particular person" of engaging in that activity, then there can be no legal seizure under the Fourth Amendment. Reasonable suspicion is the foundation of all police work, and is a standard that is taught to police officers from day one.  As such, Defendant Pauley, who

can be observed in the video, should have stopped Donahoe. But he did not, and is therefore liable under the doctrine of bystander liability.

Neither defendant should be entitled to qualified immunity. Qualified Immunity has its place, but it wouldn't be proper to give it to a police officer who admittedly stops a citizen for no legal reason in order to subject him to a background check, and then repeatedly calls him a "cocksucker" and a "sovereign citizen," merely for accurately asserting his rights under the Constitution. Nor should it be given to a police officer who stands by and observes such a violation, without taking action to protect the citizen. The defendants disagree with the holding in United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013) and are asking this Court to carve an exception around it, which would render it meaningless, which is exactly what Judge Gregory was describing in that opinion when he said that "[p]ermitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." Id.

**DEFENDANT:**

**A.      Defendant's Brief Statement of Material Facts**

The Plaintiff was stopped due to a 9-1-1 call which reported an individual walking down the side of Route 33 between the Rocky Step area and the Route 35 intersection, in Scott Depot, Putnam County, West Virginia, carrying an AR-15 style rifle.  *Depo. of Brian Donohoe*, Pg. 6, Lines 18-21; Pg. Pg. 22, Lines 1-7; see also *Depo. of Brandon Pauley*, Pg. 6, Line 17 – Pg. 7, Line 2.  As a result of that stop, Mr. Walker has pled a 42 U.S.C. § 1983 claim for unlawful search and seizure under the 4th Amendment to the United States Constitution against Cpl. Donohoe, as well as a companion 42 U.S.C. § 1983 claim for bystander liability against Dep. Pauley.

Mr. Walker was born January 11, 1994, making him twenty-four (24) years old at the time of the stop.  *Depo. of Michael Walker*, Pg. 6, Lines 20-21.  Mr. Walker testified that on the date in

question, he was walking to a friend's house to go hunting for coyotes.  *Id*. at Pg. 22, Lines 10-21.

Mr. Walker walked because his epilepsy prevents him from driving.  *Id*. at Pg. 10, Line 14.  In

doing so, Mr. Walker walked along the side of Route 33, known as "Teays Valley Road," in Scott

Depot, Putnam County, West Virginia, with an AR-15-style rifle slung across his back.  *Depo. of

Brandon Pauley*, Pg. 6, Line 17 – Pg. 7, Line 2; Pg. 7, Lines 10-15.

The first notice the Defendants received of Mr. Walker's actions was a 9-1-1 call, reporting

that a person was walking down Route 33 toward Route 35 carrying an "AR-15" or "assault rifle."

*Id*.  Dep. Pauley and Cpl. Donohoe responded to the call.  Dep. Pauley arrived first, and observed

Mr. Walker walking westbound on Route 33.  Dep. Pauley got Mr. Walker's attention and asked

him to step into a driveway, with which he complied.  Cpl. Donohoe then arrived, and Dep. Pauley

allowed the more senior and experienced officer to handle the interaction.  See *Depo. of Brandon

Pauley* at Pg. 9, Line 21 – 10, Line 9.  Dep. Pauley began his law enforcement career in April

of 2017, having less than one year of law enforcement experience at the time.  *Id*. at Pg. 5, Lines

10-19.  By contrast, Cpl. Donohoe was a career law enforcement officer with over twenty (20)

years of experience.  *Depo. of Brian Donohoe*, Pg. 5, Lines 8-12.

Both officers testified to their concerns that led them to stop Mr. Walker, and led Cpl.

Donohoe to request his identification.  Being familiar with the area, both officers knew that Mr.

Walker was within walking distance of Teays Valley Christian School, and was walking in the

direction of the school.  *Depo. of Brandon Pauley*, Pg. 16, Lines 12-20; *Depo. of Brian Donohoe*,

Pg. 22, Lines 1-16; *Depo. of Michael Walker*, Pg. 31, Lines 7-10.  This encounter took place on

the morning of February 21, 2018, seven (7) days after the well-known, nationally-covered school

shooting at Marjory Stoneman Douglas High School in Parkland, Florida, which resulted in the

murder of seventeen (17) students and faculty, and the wounding of fourteen (14) more persons,

by a gunman with an AR-15 style rifle.  *Depo. of Brandon Pauley*, Pg. 16, Lines 21-23; *Depo. of Brian Donohoe*, Pg. 22, Lines 17-21.  February 21, 2018 was a Wednesday, and school was in session.  Both officers testified that in the aftermath of a major, nationally-known crime such as that, they are on heightened alert for potential copycat crimes.

> Q. When you were -- When you received the call about his location, were you familiar with that area?
> A. Yes, sir.
> Q. Did you know that area to be less than a mile away from Teays Valley Christian School?
> A. Yes, sir.
> Q. When you arrived, was he walking in the direction of the school?
> A. Yes, sir.
> Q. Did this interaction occur less than a week after the shooting in Parkland, Florida?
> A. Yes, sir.
> Q. Would you say that after a nationally significant, major crime like that you're on a heightened alert for copycats?
> A. Yes, sir. Especially the Parkland shooting.
> Q. Did that -- Did that affect your belief as to whether a crime was about to be committed?
> A. Yes, sir.

*Depo. of Brandon Pauley*, Pg. 16, Line 11 – Pg. 17, Line 7.

> Q. When you received the call on February 21st, 2018 regarding the -- regarding a person walking down the road with an assault rifle on their back, did the call specify where exactly that person was?
> A. Yeah. They were walking between Rocky Step and Route 35 Interchange, walking towards the Route 35 Interchange.
> Q. And are you familiar with that area?
> A. Yes, sir.
> Q. Were you familiar with that area at the time?
> A. Yes, sir.
> Q. Did you know there to be a school in that area?
> A. Yes, sir.
> Q. And when you observed Mr. Walker, was he traveling in the direction of that school?
> A. Yes, sir.
> Q. And you testified earlier that you were aware at the time that less than a week prior the -- there was a nationally-covered mass shooting in a school in Parkland, Florida?
> A. Correct.

> Q. And in the immediate after- -- or the days immediately following an event like that, are you on a heightened alert for copycat crimes?
> A. Yes, sir.
> Q. Was your heightened alert for copycat crimes of the Parkland shooting a factor, again, in your concern about Mr. Walker?
> A. Yes, sir.

*Depo. of Brain Donohoe*, Pg. 22, Line 1 – Pg. 23, Line 5.

Second, both officers observed that Mr. Walker's youthful appearance, and that he possibly was under the age of eighteen (18).  This belief was bolstered by the fact that Mr. Walker was walking rather than driving, further hinting at youthfulness.  The carrying of firearms by persons under the age of eighteen (18) is a misdemeanor under West Virginia law.  See W. Va. Code § 61-7-8.

> Q. Did you, based on Mr. Walker's outward appearance, have a reasonable suspicion at the time that he may be under the age of 18?
> A. Yes, sir.
> […]
> Q. Was the fact that Mr. Walker was walking and not driving -- did that affect your belief about what his age might be?
> A. Yes.
> Q. Does someone who is walking and not driving suggest that they might be under age?
> A. Yes.

*Depo. of Brandon Pauley*, Pg. 17, Line 22 – Pg. 18, Line 4; Pg. 23, Line 23 – Pg. 24, Line 2.

> Q. Did you know Mr. Walker's age when you observed him?
> A. No, sir.
> Q. Did you believe there to be a possibility he could be under the age of 18?
> A. Possible.

*Depo. of Brian Donohoe*, Pg. 23, Lines 6-11.

When Cpl. Donohoe arrived, he perceived Mr. Walker to be ignoring Dep. Pauley by continuing to walk down the road.  *Id*. at Pg. 7, Lines 7-15.  Consequently, Cpl. Donohoe then got Mr. Walker's attention and asked who he was and asked if he had identification.  *Id*. at Pg. 10, Lines 6-12.  The officers perceived Mr. Walker to be striking a defiant tone with Cpl. Donohoe,

and heated words were exchanged between them.  *Depo. of Brandon Pauley*, Pg. 11, Line 24 – Pg. 12, Line 17.  Mr. Walker initially refused to provide his ID, claiming he didn't have to, but eventually relented.  *Depo. of Brandon Pauley*, Pg. 11, Line 24 – Pg. 12, Line 23; *Depo. of Brian Donohoe*, Pg. 10, Lines 1-15.  The identification showed that Mr. Walker was over the age of eighteen (18).  *Depo. of Brian Donohoe*, Pg. 23, Lines 12-18.  Cpl. Donohoe then called in a background check on Mr. Walker's ID, which discovered that he was not a person prohibited from possessing a firearm.  *Id*. at Pg. 23, Lines 19-22.

At this point, the officers believed that there was nothing they could legally do to prevent Mr. Walker from continuing the direction he was headed with his firearm, and Mr. Walker was permitted to leave.  *Depo. of Brian Donohoe*, Pg. 24, Line 10 – Pg. 25, Line 3.  He was not arrested or injured, and the entire interaction lasted approximately eight (8) minutes and forty-eight (48) seconds.  *Depo. of Michael Walker*, Pg. 27, Lines 2-5; Pg. 30, Lines 6-12; Pg. 36, Lines 12-14.

## B.  Defendants' Meritorious Defenses

As discussed in the Defendants' Motion for Summary Judgment, their actions in this case were lawful both as a valid investigatory stop supported by reasonable suspicion, as well as a valid exercise of the community caretaker function.  However, even in the event that the stop of Mr. Walker could be considered a constitutional violation, the Defendants are nonetheless entitled to qualified immunity.

### 1.  Reasonable suspicion existed for an investigatory stop of the Plaintiff

The objective facts known to the Defendants at the time of the stop are sufficient to create a reasonable suspicion, justifying a brief investigatory stop of the Plaintiff.  Absent a constitutional violation in the first place, a claim against such as the Plaintiff's is barred by qualified immunity.

As discussed in the foregoing section, the officers responded to a 9-1-1 call on the morning of Wednesday, February 21, 2018, which advised that a person was walking down Route 33 toward the intersection with Route 35 carrying an AR-15 style rifle.  The officers were also aware that only 7 days prior, a nationally-covered mass school shooting had occurred in Parkland, Florida, wherein a gunman had murdered 17 people and wounded 14 others with an AR-15 style rifle.

The officers, being familiar with the area, knew that Teays Valley Christian School, a private K-12 school, is located at the intersection of Route 33 and Route 35.  When they responded, they observed Mr. Walker, who was then twenty-four years old, walking in the direction of school – approximately a quarter to a half-mile away from it - with an AR-15 across his back.  Both officers testified that, based on Mr. Walker's physical appearance, they had a reasonable suspicion that he could be under the age of 18.  Further, he was walking down the side of a road rather than driving, which is an unusual activity for an adult and raises further inferences of youthfulness.  Mr. Walker admitted that he is asked to show identification to prove that he is over 18 when he purchases tobacco products.

As discussed in the Defendants' Motion for Summary Judgment, federal case law has previously held that facts of this type amount to reasonable suspicion for a brief investigatory detention.  Even in other open carry states, such as Michigan, Tennessee, and Pennsylvania, federal courts have held that officers need not observe a contemporaneous commission of a visually obvious crime in order to stop a person carrying a firearm – they must merely observe objective facts which are "sufficiently unusual for a law-abiding citizen to warrant a degree of alarm for the safety of people nearby." *Baker v. Schwarb*, 40 F.Supp.3d 881, 889 (E. D. Mich. 2014).

Furthermore, Mr. Walker's appearance, combined with the fact that he was walking and not driving, present sufficient objective facts to create a reasonable suspicion that he was carrying

a firearm while under the age of 18, which is a misdemeanor in West Virginia.  Courts have previously held that when reasonable suspicion of whether someone is of lawful age to possess an object or engage in an activity exists, law enforcement are not required to take someone's word that they are of age, and may insist on identification.  See, e.g., *Klaucke v. Daly*, 595 F.3d 20, 25 (1st Cir. 2010).

> **2.     The investigative stop of Mr. Walker was a valid exercise of the community caretaking function.**

Even in the absence of individualized suspicion of criminal activity for an investigatory stop, the stop of Mr. Walker would nonetheless be a valid exercise of the community caretaker function.  The community caretaking function of the police may come into play when there is a risk of danger to the police or others, and may, therefore, be properly classified as an example of exigent circumstances.  Community caretaking functions include stopping or seizing a citizen for his own safety and/or the safety of others, regardless of the officers' suspicion of criminal activity or lack thereof. See, e.g., *U.S. v. King*, 990 F.3d 1552, 1560 (10th Cir. 1993) ("In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person ... in order to ensure the safety of the public and/or the individual, ***regardless of any suspected criminal activity.***) (Emphasis added).

Courts have previously held that the investigatory stop of an armed person engaged in unusual or concerning behavior, even in the absence of facially illegal conduct, is a community caretaking function.  Notably, the Court in *Deffert v. Moe*, 111 F.Supp.3d 797, 806-808 (W. D. Mich. 2015) held that the officer who stopped and detained the plaintiff therein for investigatory purposes when he was observed carrying a tactical pistol outside a church in service was engaged in a valid community caretaking function.  So too were Cpl. Donohoe and Dep. Pauley, when they

engaged a person who appeared to be approaching a school with an AR-15 rifle in a brief, eight-minute investigatory stop.

### 3. Speculation regarding the officers' subjective motivations for the stop is irrelevant to the reasonable suspicion analysis.

The Plaintiff utilized his page space in this Pretrial Memorandum largely to argue that the officers were not actually motivated by the concerns they expressed regarding Mr. Walker's proximity to a school or apparent age. Those arguments are completely meritless and contrary to established precedent from the Supreme Court of the United States.

The objective facts of the encounter are that the Plaintiff, who was in his early twenties at the time, was within walking distance of a school, and walking in the direction of that school, with an AR-15 style rifle, seven (7) days after a massive nationally-covered school shooting involving the same type of firearm when he was stopped. Rather than on arguing that the totality of the circumstances does not amount to reasonable suspicion for a stop, the Plaintiff instead focuses on an argument that the officers were not subjectively motivated by these facts. Such a contention is irrelevant. If the totality of the circumstances, viewed objectively, justify a search, an officer's alleged alternate motivations do not invalidate that search. See *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); see also *Scott v. United States*, 436 U.S. 128, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."); *Flores v. City of Palacios*, 381 F.3d 391, 402-403 (5th Cir. 2004) ("Flores's car was parked on the wrong side of a two-way street, which is a violation of Texas law[…] Kalina therefore had authority to detain her[…] Whether he was actually motivated to detain her for other reasons is irrelevant.").

23

Ergo, Plaintiff's skepticism about Cpl. Donohoe's subjective motivations for stopping him is legally irrelevant, and should not come under consideration by the Court or the jury.

4. **Even if a constitutional violation did occur, the officers are entitled to qualified immunity.**

The second element of the qualified immunity analysis is, if a constitutional violation did occur, was it a violation of a right which is clearly established in law?  However, in order to bypass qualified immunity, it is not sufficient that a right be clearly established in an abstract, academic sense; it must be clearly established in the particularized application at issue in a case.  See *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id*.

As is made apparent by the abundance of case law validating the actions of police officers who initiate investigatory detentions of armed persons in concerning circumstances, it is far from clearly established that a person in an open-carry state has an unqualified right to walk toward a school armed, free from the questioning of law enforcement.  In fact, the case law tends to indicate that no such right exists.   The legal guidance which has heretofore been provided to law enforcement officers operating in the field, making decisions that affect the safety of the public, includes the following:

- Pennsylvania police officers acted on reasonable suspicion when they carried out an investigatory stop and identification background check of a large number of armed persons who entered a restaurant simultaneously, in an open carry state.  See *Banks v. Gallagher*, 686 F.Supp.2d 499 (M. D. Pa. 2009).

- A Michigan police officer acted both with reasonable suspicion and as a community caretaker when he carried out an investigatory detention of a person walking outside of a church in session dressed in all-black with a tactical pistol in a leg holster and singing loudly, also in an open carry state.  See *Deffert v. Moe*, 111 F.Supp.3d 797 (W. D. Mich. 2015).

24

- Michigan police officers acted upon reasonable suspicion in an investigatory detention of a person dressed in all-black garb, carrying in assault rifle outside of a hospital.  See *Baker v. Schwarb*, 40 F.Supp.3d 881 (E. D. Mich. 2014).

- A Tennessee park ranger acted upon reasonable suspicion when he carried out an investigatory detention of a person walking through a state park "in camouflage carrying an AK-47 across his chest" to determine whether the weapon was illegal in an open carry state.  See *Embody v. Ward*, 695 F.3d 577 (6th Cir. 2012).

- A Michigan police officer was justified in commanding a person of youthful appearance who was openly carrying a rifle to produce proof of their age, and was not required to take the person's word for it that they were of age. See *Combs v. City of Birmingham*, Case No. 12-14528, 2013 U.S. Dist. LEXIS 124335, 2013 WL 4670699 (E. D. Mich., Aug. 30, 2013).

In the absence of any contradictory controlling statutory or case law regarding situations of this type, this surplus of persuasive authority, if not demonstrating that such a stop is clearly justified, at minimum demonstrates that it is not clearly established that such a stop is illegal.  A reasonable officer operating in the legal environment created by this case law certainly could come to the conclusion that the facts of this case give rise either to reasonable suspicion for a stop, or to invoke the community caretaker role.

Dep. Pauley is even farther removed from a clear constitutional violation under the facts of this case than Cpl. Donohoe.  The worst that can be reasonably argued as to the state of the relevant law, as discussed above, is that it arguably does not clearly validate Cpl. Donohoe's actions.  It certainly does not clearly establish them as unlawful.  And it most certainly does not so clearly establish them as unlawful that a junior officer like Dep. Pauley would be constitutionally remiss in failing to intervene against his far more senior superior officer.

Accordingly, even if a constitutional violation did occur as a result of the stop at issue in this case, it is not a violation of a clearly established right, and the officers are entitled to qualified immunity.

VI.     **Contested Issues of Fact and Law with Cases and Statutory Citations.**

A.     **PLAINTIFF:**

1.     Plaintiff believes there are no contestable issue of fact in regards to liability. Plaintiff asserts, consistent with, and supported by, his memorandum in support of his motion for summary judgment, that the only issue requiring a factual determination is the issue of damages, pursuant to 42 U.S.C. 1983.

2.     Also at issue, is whether the plaintiff is entitled to seek punitive damages against the defendants. Smith v. Wade, 461 U.S. 30 (1983) (punitive damages may be awarded "when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent.").

B.     **DEFENDANTS:**

1.     The Defendants believe there are no contested issues of fact which would permit a reasonable jury to find in favor of the Plaintiff, and that they are entitled to summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

2.     Whether the objective facts known to the officers at the time of the stop – that they observed a man in his early twenties, walking distance from a school then in session, walking toward that school, carrying an AR-15 style rifle, seven (7) days after a nationally-covered school shooting involving the same style of weapon - amount to reasonable suspicion for a brief investigatory stop.  See *United States v. Foreman*, 369 F.3d 776, 781-782 (4th Cir. 2004).

3.     Whether a brief investigatory stop of a person who appears to be walking toward a school in session with an AR-15 style rifle constitutes a valid exercise of the community caretaker function.  *U.S. v. Pollard*, 595 Fed. Appx. 204, 206 (4th Cir.2014); see also *U.S. v. King*, 990 F.3d 1552, 1560 (10th Cir. 1993) ("In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person ... in order to ensure the safety of the public and/or the

individual, ***regardless of any suspected criminal activity.***) (Emphasis added).

    4.    In the event that a violation of Mr. Walker's constitutional rights did occur, whether the Defendants are entitled to qualified immunity.  As employees of a municipality acting within the scope of their employment, two elements must be met in order to subvert qualified immunity. "First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Tarantino v. Baker*, 825 F.2d 772, 774-75 (4th Cir. 1987), *cert. denied*, 489 U.S. 1010, 103 L. Ed. 2d 180, 109 S. Ct. 1117 (1989)).

## VII.   <u>Stipulations</u>.

    **A.**    **Plaintiff's Proposed Stipulations.**

        1.    Plaintiff will stipulate as to the authenticity of documents proposed as exhibits.

        2.    Plaintiff will stipulate that the defendant officers were acting under color of law at all relevant times.

        3.    Plaintiff will stipulate that Michael Walker had a right guaranteed by the Constitution to be free from unreasonable search and seizure.

    **B.**    **Defendants' Proposed Stipulations.**

        1.    Defendants will stipulate as to the authenticity of documents proposed as exhibits.

## VIII.  <u>Suggestions for the Evidence of Unnecessary Proof and Cumulative Evidence</u>.

    **A.**    **Plaintiff's Suggestions.**

None at this time.

    **B.**    **Defendants' Suggestions.**

None at this time.

IX. **Suggestions Concerning Any Need for Adopting Special Procedure for Managing Potentially Difficult or Protracted Aspects of the Trial That May Involve Complex Issues, Multiple Parties, Difficult Legal Questions or Unusual Proof Problems.**

Unknown at this time.

X. **A List of Special Voir Dire Questions.**

A. **Plaintiff's Questions:**

1. Do you know, or are you related to, any attorney involved in this action.

2. Do you know, or are you related to, any employees of any law firm involved in this action.

3. Have you ever been a client of any law firm involved in this action.

4. Do you know any party to this action.

5. Do you know any person listed on the witness list for either party.

6. Do you know, or are you related to any police officer or employee of the any law enforcement agency.

7. Have you served as a law enforcement officer, or are you related to a law enforcement officer.

8. Have you, or any of your close family members or friends ever worked for a lawyer, or in a law office, or have experience in the legal field or court system?

9. This is a case that involves allegations that certain police officers violated the civil rights of the Plaintiff.  The defendants deny the allegations. Would anyone here have any personal concerns rendering a verdict against a defendant police officer.

B. **Defendants' Questions:**

1. Please refer to Defendants' Proposed Voir Dire, attached hereto as Exhibit A.

XI. **A Statement Setting Forth A Realistic Estimate of the Number of Trial Days Required.**

A.    **Plaintiff.**

Plaintiff expects the trial of this matter to last from two to three days.

B.    **Defendants.**

Defendants expect the trial of this matter to last from two to three days.

XII.    **Courtroom Technology Requests For Use At Trial.**

A.    **Plaintiff.**

Plaintiff intends to utilize the court's current courtroom technology in order to play the video of the encounter at issue herein.

B.    **Defendants.**

The Defendants do not anticipate any specific courtroom technology needs.

XIII.    **Any Other Matters Relevant for Pretrial Discussion or Disposition, Including Those Set Forth in Fed. R. Civ. P. 16.**

**Plaintiff:**

1.    Plaintiff's only objections to the defendants' Rule26(a)(3) disclosures are the inclusion of any information about the completely unrelated Parkland School Shooting, or AR-15s in general, since they are wholly irrelevant to this litigation, inherently offensive, and inflammatory. Plaintiff intends to object to the same via motion in limine, or in such manner preferred by the Court.

**Defendant:**

1.    The Defendants object to the Plaintiff showing the jury portions of the video recording of the interaction which show Cpl. Donohoe employing coarse language and the Plaintiff lecturing a video audience on what he believes the law to be.  Such portions of the video are irrelevant to the merits of Plaintiff's claim as they have no bearing on the constitutionality of the

stop, but have great potential to inflame and confuse the jury, respectively.  The Defendants have

filed a motion in *limine* regarding the same.

**MICHAEL WALKER,**
**By Counsel**

**/s/ John H. Bryan** _____
**John H. Bryan (WV Bar No. 10259)**
**JOHN H. BRYAN, ATTORNEYS AT LAW**
**611 Main Street**
**P.O. Box 366**
**Union, WV 24983**
**(304) 772-4999**
**Fax: (304) 772-4998**
**jhb@johnbryanlaw.com**
*Counsel for Plaintiff*

**BRIAN E. DONOHOE and BRANDON**
**W. PAULEY,**
**By Counsel,**

 **/s/ Adam K. Strider** _____
 **Charles R. Bailey (WV Bar #0202)**
 **Adam K. Strider (WV Bar #12483)**
 **BAILEY & WYANT, PLLC**
 **500 Virginia Street, East, Suite 600**
 **Post Office Box 3710**
 **Charleston, West Virginia  25337-3710**
 **T: 304.345.4222**
 **F: 304.343.3133**
 **cbailey@baileywyant.com**
 **astrider@baileywyant.com**
 *Counsel for Defendants*